[Cite as *State v. Long*, 2017-Ohio-9322.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 16AP-708 |
| v. | : | (C.P.C. No. 15CR-3564) |
| Michael A. Long, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on December 29, 2017

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Laura R. Swisher*, for appellee. **Argued:** *Laura R. Swisher*.

**On brief:** *Koenig & Long, LLC*, and *Charles A. Koenig*, for appellant. **Argued:** *Charles A. Koenig*.

APPEAL from the Franklin County Court of Common Pleas

SADLER, J.

{¶ 1} Defendant-appellant, Michael A. Long, appeals from a judgment of the Franklin County Court of Common Pleas convicting him of aggravated burglary, in violation of R.C. 2911.11, kidnapping, in violation of R.C. 2905.01, aggravated robbery, in violation of R.C. 2911.01, two counts of felonious assault, in violation of R.C. 2903.11, murder, in violation of R.C. 2903.02, attempted grand theft when the property is a firearm or dangerous ordinance, in violation of R.C. 2923.02 as it relates to R.C. 2913.02, and having weapons while under disability, in violation of R.C. 2923.13. For the reasons that follow, we reverse and remand for a new trial.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2}   The events that gave rise to this appeal occurred in the early morning hours of July 17, 2015, involving appellant and his friend Clement "Poncho" Cooper.  The theory of plaintiff-appellee, State of Ohio, is that appellant and Poncho broke into a home occupied by several members of the Bowles family located at 3831 Scales Drive, Columbus, Ohio.  According to witnesses, appellant and Poncho broke into the home to steal guns while the Bowles family members were away at work.  When the Bowles family returned to their home, Jill Bowles found her son Timmy laying on the basement floor tied up with an extension cord.  Other members of the Bowles family found appellant and Poncho in the home. A melee ensued during which Shawn Bowles received numerous stab wounds from Poncho about the head and neck as he held Poncho in a choke hold.  When the police arrived, they found Poncho dead from asphyxia.  Jill received a gunshot wound during the incident.

{¶ 3}   The defense theory of the case was that the entire incident and Poncho's death were the tragic result of a love triangle between Timmy, his ex-girlfriend Elaine, who resided in the Scales Drive address with Timmy's parents, Jill and Tim Bowles, Sr., and Poncho, who was reportedly dating Elaine.  According to the defense, Elaine had argued with Poncho the evening prior to the incident, and Poncho had ended up with Elaine's cell phone.  The defense claims Elaine invited Poncho and appellant to the Scales Drive residence so she could recover her cell phone.  When Timmy found Poncho in the home, the two began fighting.  Appellant maintains that he did not break into the Bowles' home to steal guns. Appellant further maintains that he was invited into the home and that Poncho's death was the result of Timmy's jealousy over Elaine, not the result of appellant's attempt to commit a theft offense.

{¶ 4}   On July 22, 2015, a Franklin County Grand Jury indicted appellant on the following charges: aggravated burglary, in violation of R.C. 2911.11, a felony of the first degree; kidnapping, in violation of R.C. 2905.01, a felony of the first degree; aggravated robbery, in violation of R.C. 2911.01, a felony of the first degree; two counts of felonious assault, in violation of R.C. 2903.11, a felony of the second degree; murder, in violation of R.C. 2903.02, an unclassified felony; and attempted grand theft when the property is a firearm or dangerous ordinance with firearm specification, in violation of R.C. 2923.02 as

it relates to R.C. 2913.02, a felony of the fourth degree.  Each of the above listed charges included a firearm specification.  Appellant was also indicted for having weapons while under disability, in violation of R.C. 2923.13.

{¶ 5}   On August 1, 2016, the jury trial commenced.  At the opening of court, the trial judge made the following announcement in the presence of the jury:

> THE COURT:  * * * I just wanted to let everyone know in the courtroom that we are here to resolve this case, right?  And so you need to be very careful about what you say and do, who you talk to and the like, so that there is no mistrial or anything that causes a disturbance to the trial.  Because if there is anything that I think is going to distract the jurors, I'm going to have to ask you to leave the courtroom; and then, if there are other things that happen that [appellant's trial counsel] can talk to you about, like talking to witnesses or anything like that, it would cause us to start all over again and you wouldn't get the resolution that we're here today to start.

 (Tr. Vol. 1 at 5-6.)

{¶ 6}   On August 2, 2016, appellee presented the testimony of several witnesses, including police officers and detectives who were involved in the case.  On August 3, 2016, appellee produced testimony from a forensic expert, several members of the Bowles family, and a family friend who was in the home on July 17, 2015.

{¶ 7}   On August 4, 2016, prior to continuing with the trial, the court and counsel examined juror number 4, outside the presence of the other jury members, regarding efforts allegedly made by someone associated with appellant to relay a message to juror number 4 through the juror's son-in-law.  The transcript of the trial court's examination of juror number 4 reveals that some unidentified person contacted the son-in-law because he wanted someone to "get with" the juror.[1]  Juror number 4 told the court, after speaking

---

[1] We note that the colloquy between juror number 4 and the trial court indicates that someone called "the jack" contacted the son-in-law, but the motive behind the contact is unclear.  The transcript provides, in relevant part, as follows:

> THE COURT:  So, someone asked your son-in-law --
> JUROR NO. 4:  No, someone -- and he -- the way it came to me was they asked someone to get with me.  So then the jack transferred it on to my son-in-law.  My son-in-law called me.
> THE COURT:  Mm-hmm.  And when you said they asked --
> JUROR NO. 4:  To just get with me, I don't know what that meant.  I didn't know which way it was going, you know.  So, that's why I'm here.  Because they may be --

with his son-in-law, he realized that he might know appellant.  According to juror number 4, he and appellant are part of the same "motorcycle set," meaning they are both members of local motorcycle clubs.  (Tr. Vol. 3 at 464.)  Juror number 4 told the court that he did not realize he knew appellant at the start of the trial because he knew appellant by the nickname he used in the motorcycle club and therefore did not know appellant's real name.  Juror number 4 told the court he had not spoken to any of the other jurors regarding this issue.

{¶ 8}  Following the examination of juror number 4, the court made the following ruling:

> THE COURT:  * * * I think you probably understand why we have to thank you for answering your jury summons and being fair and attentive up until this point.  But based on the attempted messages to you as well as the fact that you even have any kind of connection at all to the defendant, we are going to excuse you from your service.
>
> JUROR NO. 4:  Mm-hmm.  I have no problem with that.

(Tr. Vol. 3 at 468.)

{¶ 9}  Following this ruling, and before the state called its next witness, the trial court decided, sua sponte, to close the courtroom to the public.  The trial court announced its ruling on the record as follows:

---

THE COURT:  Well, you know, get with you could mean injure you.
JUROR NO. 4:  Mm-hmm.
THE COURT:  Or it could mean talk to you, like, get with you, hook up, meet up with you.
JUROR NO. 4:  Or try to find out what's going on also.
THE COURT:  Yep.
JUROR NO. 4:  I look at that the same way.
THE COURT:  Mm-hmm.
JUROR NO. 4:  I was, like, how did he -- so I noticed that he kept looking at me, and I kept figuring out, like, I've seen him somewhere, but it don't really look like him.

* * *

JUROR NO. 4:  * * * But I didn't know which way that went.  But I do have my eyes open now, though, in case.  I mean, I'm okay.  I ain't worried about it, really.  You know, but it could have been some repercussions behind this.  I feel like if I made a judgment, you know, maybe it would have, maybe it wouldn't.  I didn't know which way it was going.  So that's why I came in.  Well, mainly, I came in to let you all know from the start, because after they put it together for me, it came to me on who he was.

(Tr. Vol. 3 at 465-68.)

> At the beginning of the trial, there was an altercation in the hallway between -- I'm not sure who but someone in the Bowles family. After that occurred, the court stated to everyone that was in the courtroom that what -- they had to be careful what they said or did, because their actions could cause them to be asked to leave the courtroom or for them -- or for us to have to start this trial over.
>
> It has come the court's attention that someone associated with the defendant -- I don't know who, but someone associated with the defendant did try and contact one of the jurors, which is very concerning, because the goal here is to have a fair trial unimpeded by outside influences. So for those reasons and in this context I am going to shut the courtroom down.
>
> The goal of shutting the courtroom down is -- well, first of all, I'm going to excuse that juror, and I swore in all of the jurors as regular jurors anyway. So one of the alternates, Alternate No. 1, will replace that juror. However, that doesn't completely solve the problem, because I don't know who it was that called the juror who is going to be excused. So for that reason and in order to preserve the integrity of this trial, I am going to shut the courtroom down, so that no one else has an opportunity to see or hear what's going on in this courtroom. Again, it is to make sure we have a fair and impartial trial that is not influenced by any outside sources.

(Tr. Vol. 3 at 470-71.)

{¶ 10} Neither party objected to the trial court's ruling. The courtroom remained closed to the public for the remainder of the trial including the testimony of the deputy coroner, Timmy Bowles, and Shawn Bowles. Appellant rested his case without calling any witnesses. Prior to sending the case to the jury, the trial court clarified that "we * * * close[d] the courtroom to everyone except the media. * * * [O]nce the jury comes up with a verdict, the concern about contacting jurors is gone. So the courtroom will be open back up to everyone if and when we get a verdict."[2] (Tr. Vol. 4 at 599.)

{¶ 11} The jury subsequently found appellant guilty of all charges in the indictment. The trial court found appellant guilty of the offense of having weapons while

---

[2] This statement makes apparent that the trial court's concern with closing the courtroom was not to ensure the safety of the jurors and participants of the trial but, rather, to protect the jurors from outside influences.

under disability. After merging several counts in the indictment for purposes of conviction and sentence, and ordering appellant to serve several of the prison terms concurrently, the trial court imposed an aggregate sentence of 25 years to life.

{¶ 12} Appellant timely appealed to this court from the judgment of the trial court.

## II. ASSIGNMENTS OF ERROR

{¶ 13} Appellant asserts the following four assignments of error:

> 1. The trial court deprived Appellant of his constitutional rights to a public trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution, when it closed his trial to the public.
>
> 2. Appellant was deprived of his constitutional rights to due process in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution, as a consequence of ineffective assistance of counsel.
>
> 3. The evidence adduced at trial is insufficient as a matter of law to support Appellant's convictions on the charge of Kidnapping.
>
> 4. The trial court erred when it sentenced Appellant to consecutive terms of imprisonment without making the required findings set forth in the Ohio Revised Code section 2929.14(C)(4).

## III. LEGAL ANALYSIS

### A. First Assignment of Error

{¶ 14} In appellant's first assignment of error, appellant contends the trial court committed reversible error when it closed the trial to the public. We agree.

{¶ 15} In *State v. Sowell*, 10th Dist. No. 06AP-443, 2008-Ohio-3285, this court discussed the constitutional significance of the right to a public trial as follows:

> The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." Section 10, Article I, Ohio Constitution also guarantees an accused the right to a public trial. Historically, the right to a public trial has been recognized as a safeguard against possible

infringements against the accused. *State v. Grant*, Cuyahoga App. No. 87556, 2007-Ohio-1460, at ¶ 12. "An open courtroom is necessary to preserve and support the fair administration of justice because it encourages witnesses to come forward and be heard by the public, discourages perjury by the witnesses, and ensures that the judge and prosecutor will carry out their duties properly." *Id.*, citing *State v. Lane* (1979), 60 Ohio St.2d 112, 119, 397 N.E.2d 1338, and *Waller v. Georgia* (1984), 467 U.S. 39, 104 S.Ct. 2210, 81 L. Ed. 2d 31. Further, a public trial permits the general public to observe that the accused is " 'fairly dealt with and not unjustly condemned, and that the presence of the interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions.' " *Id.*, quoting *Waller* at 43. The public's right to attend criminal trials is also implicit within the guarantees of the First Amendment. *State v. Morris*, 157 Ohio App.3d 395, 398, 2004-Ohio-2870, 811 N.E.2d 577, citing *State ex rel. The Repository, Div. of Thompson Newspapers, Inc. v. Unger* (1986), 28 Ohio St.3d 418, 420, 28 Ohio B. 472, 504 N.E.2d 37.

*Id.* at ¶ 32.

{¶ 16} Because of the constitutional significance of an accused's right to a public trial, "[t]he violation of the right to a public trial is considered structural error and not subject to harmless-error standard." *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, ¶ 50, citing *Waller v. Georgia*, 467 U.S. 39, 49-50 (1984), fn. 9. " 'A structural error is a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." ' " *Sowell* at ¶ 33, quoting *Drummond* at ¶ 50, quoting *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). Because the denial of a defendant's right to a public trial under Article I, Section 10 of the Ohio Constitution is considered structural error, it "cannot be waived by the defendant's silence." *State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, ¶ 81. Consequently, appellant did not waive his right to a public trial in this case by a failure to object at trial. *Id. See also Sowell* at ¶ 36.

{¶ 16} The right to a public trial is not absolute, however, and an order barring spectators from observing a portion of an otherwise public trial does not necessarily introduce error of constitutional dimension. In *Waller,* the Supreme Court of the United States set forth the following four-part test trial courts should apply in determining

whether a courtroom closure is warranted: 1) the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced; 2) the closure must be no broader than necessary to protect that interest; 3) the trial court must consider reasonable alternatives to closing the proceeding; and 4) the trial court must make findings adequate to support the closure. *Bethel* at ¶ 82, quoting *Waller* at 48.

{¶ 17} The Supreme Court of Ohio in *Drummond* subsequently modified the *Waller* test in cases where the trial closure is partial rather than total. In *Drummond*, the court concluded that "[w]hen a trial judge orders a partial, as opposed to a total, closure of a court proceeding, a 'substantial reason' rather than *Waller*'s 'overriding interest' will justify the closure." *Id.* at ¶ 53.

{¶ 18} In *Drummond*, the defendant was on trial for capital murder in connection with a gang-related drive-by shooting. During the trial, there had been a physical altercation between a spectator and courtroom deputies and another incident where "one of the spectators * * * showed total disrespect to the Court in chambers." *Id.* at ¶ 32. There was also an earlier disturbance involving a member of the victim's family and a spectator, as well as an incident where "John Drummond approached a potential juror's husband in the jail." *Id.* at ¶ 40. The trial judge closed the courtroom to all spectators during the cross-examination of one witness and the testimony of two other witnesses. The trial judge permitted the media to remain in the courtroom. The trial court cited the prior altercations and "the fear of retaliation expressed by various witnesses" as justification for the closure. *Id.* at ¶ 54. The court of appeals affirmed the conviction, and appellant appealed to the Supreme Court arguing the trial court violated his right to a public trial.

{¶ 19} With respect to the first *Waller* factor, the *Drummond* court concluded "the dangerous nature of gang violence and the genuine need to protect witnesses testifying against gang members from the deadly threat of retaliation" provided the trial court with a substantial reason or interest in closing the courtroom. *Id.* at ¶ 54. The *Drummond* court concluded, as to the second *Waller* factor, that the closure of the courtroom during the testimony of three state witnesses was not broader than necessary. *Drummond* at ¶ 55. The court also noted the fact that the media remained in the courtroom "helped

safeguard Drummond's right to a public trial" because the witnesses' awareness of the media minimized the risk that they would alter their testimony. *Id.*

{¶ 20} Though the *Drummond* court found, as to the third *Waller* factor, that the trial court did not consider alternatives to closing the courtroom, the court did not believe this was error given the fact the closure was only during the testimony of three specific witnesses. *Drummond* at ¶ 57. Finally, as to the fourth factor, the *Drummond* court found "the trial court should have made additional findings to clarify the reasons for closing the court." *Id.* at ¶ 58. Nevertheless, because the trial court stated on the record there had been a physical altercation between spectators and courtroom deputies, another incident occurred in the judge's chambers, and certain witnesses related their fear of retaliation if they testified in open court, the Supreme Court concluded the reasons expressed by the trial court for the limited closure were adequate. *Id.*

{¶ 21} Here, the closure of the courtroom is arguably a partial closing inasmuch as several witnesses had testified prior to the closing, and the trial court permitted the media to remain in the courtroom. However, unlike the situation in *Drummond*, the trial court did not close the courtroom during the testimony of any particular witness to protect the safety and welfare of the witness. Rather, the trial court closed the courtroom to all but the media once the trial judge felt the circumstances warranted closure, out of an apparent concern for the integrity of the process. Even considering the closure in this case as a partial closure for purposes of conducting the *Waller* analysis, we find, under these facts, the trial court abused its discretion by closing the courtroom to the public.

{¶ 22} With regard to the first *Waller* factor, because we consider the closure in this case to be partial, the trial judge needed a "substantial reason" to close the trial to the public. The trial judge articulated the following reason on the record:

> At the beginning of the trial, there was an altercation in the hallway between -- I'm not sure who but someone in the Bowles family. After that occurred, the court stated to everyone that was in the courtroom that what -- they had to be careful what they said or did, because their actions could cause them to be asked to leave the courtroom or for them -- or for us to have to start this trial over.
>
> It has come the court's attention that someone associated with the defendant -- I don't know who, but someone associated

with the defendant did try and contact one of the jurors, which is very concerning, because the goal here is to have a fair trial unimpeded by outside influences. So for those reasons and in this context I am going to shut the courtroom down.

The goal of shutting the courtroom down is -- well, first of all, I'm going to excuse that juror, and I swore in all of the jurors as regular jurors anyway. So one of the alternates, Alternate No. 1, will replace that juror. However, that doesn't completely solve the problem, because I don't know who it was that called the juror who is going to be excused. So for that reason and in order to preserve the integrity of this trial, I am going to shut the courtroom down, so that no one else has an opportunity to see or hear what's going on in this courtroom. Again, it is to make sure we have a fair and impartial trial that is not influenced by any outside sources.

(Tr. Vol. 3 at 470-71.)

{¶ 23} At appellant's sentencing hearing, the trial court clarified the extent to which it closed the trial to the public as follows:

THE COURT: Just so everyone is clear on everything -- you can have a seat. You know, Monday there was an issue out in the hallway between the Bowles family and some other people that were here in support of [appellant] and/or -- he's been called Poncho so many times now, I'm sorry. I can't remember his real name. So for that reason and because of that altercation in the hallway, through the course of the trial, there have been two deputies in here as well as two deputies outside of the courtroom, which served us well through Thursday when we received news that one of the jurors -- there had been some attempts made to contact one of the jurors.

We went on the record regarding that attempted contact. We did excuse that juror. However, the court has already put on the record that that did not completely solve the problem, because we did not know who it was that tried to contact the juror, and that already has been placed on the record, to prevent any more such attempts. To make sure that there was a separation of witnesses and to preserve the integrity of [appellant's] trial, we did close the courtroom to everyone except the media.

(Tr. Vol. 4 at 598-99.)

{¶ 24} First, we believe the trial court properly handled the altercation in the hallway prior to trial by posting two deputies in the courtroom and two deputies in the hallway on the first day of trial.  There is nothing in the record to suggest that any further altercations took place either in the courtroom or in the hallway on August 2 or 3.  Accordingly, the posting of the extra deputies appears to have resolved the issues of safety and security in the courtroom and hallway.  Consequently, the altercation that occurred in the hallway on the first day of trial could not have provided the trial court with a substantial reason to close the courtroom to the public on August 4.

{¶ 25} Moreover, even if the trial court believed that the altercation on the first day of trial involving a member of the Bowles family necessitated stronger measures to preserve courtroom safety and security on the fourth day of trial because of the subsequent incident with juror number 4, the trial judge did not consider alternatives to closing the trial to the public.  For instance, the record does not show that the trial court considered prohibiting non-testifying family members from attending the trial.  Even if the trial court's concern had been security in the courtroom, because no further altercations had occurred, excluding the family members would have been a more narrowly tailored solution than closing the trial to the public.  *Sowell* at ¶ 39, citing *Shepard v. Artuz*, S.D.New York No. 99 Civ. 1912 (Apr. 19, 2000), quoting *United States ex rel. Orlando v. Fay*, 350 F.2d 967, 971 (2d Cir.1965) (a trial court may exclude disorderly spectators after " 'balanc[ing] between the requirement that the actions of the courts be open to public scrutiny and the need to have the trial proceed in an orderly manner' "); *State v. Dubose*, 174 Ohio App.3d 637, 2007-Ohio-7217, ¶ 105 (7th Dist.) (the trial court should have identified the problem spectators and only excluded them from the courtroom, rather than closing the trial to the public and the media).  Though *Drummond* and *Waller* required the trial court to consider other available options before closing the trial, it does not appear from the record that the trial court did so in this case.

{¶ 26} Similarly, we fail to see how the incident with juror number 4 could have provided a substantial reason to close the courtroom to the public.  Juror number 4 realized he was acquainted with appellant as a fellow member of the "motorcycle set" after his son-in-law relayed a message to him from an unidentified third party who recognized

juror number 4. (Tr. Vol. 3 at 464.) The trial judge excused juror number 4 after he disclosed the improper contact. In our view, excusing juror number 4 resolved the issue.

{¶ 27} In *Drummond*, the trial court closed the trial to the public during the testimony of certain witnesses who expressed a fear of retaliation from persons associated with the accused. Thus, in *Drummond*, there was a clear nexus between the trial court's decision to close the trial to the public and the need to eliminate of risk of harm to certain witnesses. Unlike the *Drummond* case, neither the jurors nor any other participant in the trial expressed concerns for their physical safety.

{¶ 28} In this case, given the unique nature of the improper contact with juror number 4, we do not perceive an increased risk that the same unidentified individual or another member of the public would contact other jurors. The trial had been open to the public for three days prior to the time the trial court decided to close the court to the public. Consequently, closing the trial to the public on August 4, 2016 would not have prevented similar attempts to contact other jurors. Simply put, the record does not reveal any increased risk of jury tampering arising from the prior contact with juror number 4 that would have justified closing the trial to the public.

{¶ 29} Moreover, in consideration of the second and third *Waller* factors, even if it were reasonable to conclude that a risk of further jury contact existed in this case as a result of the improper contact with juror number 4, the trial judge could have taken other measures short of closing the trial to the public which would have eliminated the risk.

{¶ 30} R.C. 2945.31 provides for the separation of jurors as follows:

> After the trial has commenced, before or after the jury is sworn, the court may order the jurors to be kept in charge of proper officers, or they may be permitted to separate during the trial. If the jurors are kept in charge of officers of the court, proper arrangements shall be made for their care, maintenance, and comfort, under the orders and direction of the court. In case of necessity the court may permit temporary separation of the jurors.[3]

Crim.R. 24(H)(1) and Ohio Sup.R. Standard 19(A) provide a trial court may, on its own initiative, sequester a jury for the purpose of insulating its members from improper

---

[3] R.C. 2945.32 requires the clerk of the court of common pleas to administer an oath to any officer in charge of the jurors if the court orders jury sequestration in a criminal case.

information or influences. Though such a measure may certainly inconvenience the jury and results in additional expense, sequestering the jury would have eliminated the risk of improper juror contact in this case without infringing on appellant's constitutional right to a public trial. The record does not show the trial court considered the available alternative of jury sequestration, as permitted by R.C. 2945.31 and Ohio Sup.R. Standard 19, or any other measure to ensure "a separation of witnesses and to preserve the integrity of [appellant's] trial." (Tr. Vol. 4 at 599.) Thus, the trial court erred when it failed to consider reasonable alternatives to closing the proceeding as required by *Drummond* and *Waller*.

{¶ 31} With regard to the final *Waller* factor, as noted above, the trial judge made two findings in support of the decision to close the trial to the public: 1) the altercation involving a Bowles family member that occurred in the hallway on the first day of trial; and 2) the improper indirect contact with juror number 4. The trial court made no other findings in support of its decision, and the record does not disclose any other incidents or circumstances that would have necessitated the closing of the trial to the public. If there were other relevant incidents or circumstances justifying closure that are not evident from the record, the trial court made no such findings. We cannot agree with the trial court's conclusion that the cumulative effect of the two specified incidents affected the integrity of the proceedings in such a way that closing the trial to the public became necessary. For the reasons stated above, it is our determination that the findings of the trial court are insufficient to warrant denial of appellant's constitutional right to a public trial.

{¶ 32} "As has been aptly stated, 'the courtroom in Anglo-American jurisprudence is more than a location with seats for a judge, jury, witnesses, defendant, prosecutor, defense counsel and public observers; *the setting that the courtroom provides is itself an important element in the constitutional conception of trial*, contributing a dignity essential to the "integrity of the trial" process.' " (Emphasis sic.) *State v. Lane*, 60 Ohio St.2d 112, 119 (1979), quoting *Estes v. Texas*, 381 U.S. 532, 561 (1965). In *Lane*, the Supreme Court of Ohio identified "at least four policy reasons for safeguarding the need for public trials." *Id.* at 119. The court stated that "a public trial assures testimonial trustworthiness by inducing fear of testimony falsely given * * *; * * * a public trial makes the proceedings known to a possible material witness who might otherwise be unknown

to the parties * * *; and * * * public trial allows the public to learn about the functioning of their government."  (Internal citations omitted.)  *Id.*

{¶ 33} For the foregoing reasons, we find the trial court's failure to satisfy the *Waller* test and lack of a substantial reason to close the trial to the public, as required by *Drummond*, violated appellant's Sixth Amendment right to a public trial and mandates reversal.  Though we recognize and appreciate the trial court's desire to avoid a "mistrial or anything that causes a disturbance," the lack of a record to support closing the courtroom on August 4, 2016 and the failure to consider other available and alternative measures leaves this court with no alternative but to find that the trial court abused its discretion.  (Tr. Vol 1 at 5.)  We further find the appropriate remedy is to reverse the judgment of the trial court and remand this matter for a new trial.  *State v. Woods*, 8th Dist. No. 94141, 2011-Ohio-817, ¶ 29; *Dubose* at ¶ 3.

{¶ 34}  For the foregoing reasons, we sustain appellant's first assignment of error.

### B.  Second, Third, and Fourth Assignments of Error

{¶ 35} Because we have sustained appellant's first assignment of error and remanded this cause for a new trial, appellant's second assignment of error alleging ineffective assistance of counsel, appellant's third assignment of error alleging insufficiency of the evidence as to the kidnapping conviction, and appellant's fourth assignment of error alleging failure of the trial court to make findings in support of consecutive sentences are rendered moot.  App.R. 12(A)(1)(c).

## IV.  CONCLUSION

{¶ 36} Having sustained appellant's first assignment of error and having determined that appellant's remaining assignments of error are moot, we reverse the judgment of the Franklin County Court of Common Pleas and remand this matter for a new trial.

*Judgment reversed;*
*cause remanded.*

BROWN and LUPER SCHUSTER, JJ., concur.

_____