[Cite as *State v. Motion*, 2018-Ohio-737.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 104470

---

# STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

# FLOYD L. MOTON

DEFENDANT-APPELLANT

---

## JUDGMENT:
AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-15-593636-A

**BEFORE:** Stewart, J., Keough, P.J., and Boyle, J.

**RELEASED AND JOURNALIZED:** March 1, 2018

**ATTORNEYS FOR APPELLANT**

Richard Agopian
7466 Huntz Drive
Cheyenne, WY 82009

Matthew C. Bangerter
Bangerter Law, L.L.C.
P.O. Box 148
Mentor, OH 44061


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

Hannah Smith
Brian Radigan
Assistant County Prosecutors
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, OH 44113

MELODY J. STEWART, J.:

**{¶1}** The court found defendant-appellant Floyd L. Moton guilty of aggravated murder, murder, felonious assault, and having a weapon while under disability (along with associated firearm specifications) for shooting the victim as the victim sat in his car. The issues on appeal argue that the court violated Moton's right to a public trial by limiting the number of people who could attend trial; that the convictions were not supported by sufficient evidence and were otherwise against the manifest and weight of the evidence; and that the court improperly admitted hearsay evidence. We find no error and affirm.

## I. Evidence

**{¶2}** The second, third, and fourth assignments of error raise issues relating to the sufficiency and weight of the evidence.

## A. Sufficiency of the Evidence

**{¶3}** In the second and third assignments of error, Moton complains that the state failed to prove the aggravated murder charge contained in Count 1; the felony murder charge in Count 2; the felonious assault charge in Count 3; the weapons while under disability charge in Count 4, and the firearm specifications.

**{¶4}** The state charged Moton with aggravated murder under R.C. 2903.01(A). That section states that no person shall purposely, with prior calculation and design, cause

the death of another. Moton argues that the state failed to prove that he acted with prior calculation and design because there was no evidence that the shooting was a planned act.

{¶5} We determine whether a conviction is supported by sufficient evidence by viewing the evidence in a light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶6} Although there is no bright-line test for what constitutes advanced reasoning to formulate the purpose to kill, courts consider the following three factors: "(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or 'an almost instantaneous eruption of events?'" *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶ 20, quoting *State v. Taylor*, 78 Ohio St.3d 15, 19, 676 N.E.2d 82 (1997), quoting *State v. Jenkins*, 48 Ohio App.2d 99, 102, 355 N.E.2d 825 (8th Dist.1976).

{¶7} Police responding to a call of a shooting found the victim in a parked car that was running with its headlights on. The victim had been shot twice in the head from no more than 18 inches away. He was holding a cell phone. The victim's cell phone contained contact information for a person named "Floyd." On the day the murder occurred, the victim called Floyd's phone five times; two of those were missed calls occurring at 6:25 p.m. and 6:29 p.m. At around 6:40 p.m., witnesses saw vehicles

belonging to both Moton and the victim in the parking lot. One witness testified that she heard shouting and then saw a man open the victim's car. She watched the man's hands recoil and then heard gunshots.

{¶8} Witnesses said that the shooter drove a truck or pickup truck. Surveillance video taken from the time of the shooting enabled the police to identify the make and model of the truck. Bureau of Motor Vehicles records showed that Moton had very recently registered a truck matching the description of the vehicle used by the shooter. The police recovered Moton's DNA from the door handle of the victim's car. Surveillance cameras captured the truck circling the area just prior to when the murder occurred. The truck could not be located after the murder.

{¶9} An examination of the victim's cell phone showed that he received telephone calls from a person named "Floyd." The calls were made with a cell phone using a prepaid data plan that could not be traced to the owner. The police were, however, able to obtain a log of the calls made from the "Floyd" phone and determined that seven calls were made from that phone to the victim's phone. After the murder, no more calls were made from the "Floyd" phone nor could the phone be recovered.

{¶10} For purposes of the prior calculation and design test, it appears that Moton and the victim knew each other as evidenced by the phone records. In addition, the records of phone calls made just prior to the murder create the inference that Moton planned to meet the victim; indeed, surveillance footage showed that he drove around the area where the murder occurred as though waiting for the victim to arrive. The court

could find that Moton contemplated the use of force by bringing a firearm to the meeting.

{¶11} It was unclear whether the murder was drawn out or an instantaneous eruption of events: the witnesses only heard shouting and saw the shooting, so there was no additional context. Nevertheless, in *Walker*, the Supreme Court stated that "[s]hooting a person execution-style may also establish, at least in part, prior calculation and design." *Walker,* 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, at ¶ 21. When announcing its verdict, the court stated, "for a finder of fact I think [the murder] can only be seen as one thing. It was an execution. It was clear to me that there was prior calculation and design." This was a rational conclusion given that Moton knew the victim, used an untraceable cell phone when calling the victim, appeared to preplan a meeting with the victim, was armed when he met the victim in the parking lot, and then shot the victim execution-style from only inches away. The shooting occurred so quickly that the victim did not even appear to have time to defend himself. These facts gave rise to the inference that Moton executed the victim, thus establishing that he acted with prior calculation and design. And the same facts also prove that he possessed an operable firearm.

{¶12} Having found the conviction for aggravated murder to be supported by legally sufficient evidence, we need not consider Moton's arguments in his third assignment of error that the murder and felonious assault counts were also unsupported by legally sufficient evidence. The court determined that the murder and felonious assault

counts were allied offense of similar import under R.C. 2941.25(A). The state elected to have Moton sentenced on the aggravated murder count; the murder and felonious assault counts were merged for sentencing. Error, if any, with respect to the sufficiency of the evidence supporting the finding of guilt for murder and felonious assault would be harmless. *State v. Powell*, 49 Ohio St.3d 255, 263, 552 N.E.2d 191 (1990) (even if evidence of one count was insufficient to support the conviction, the fact that the count merged with another that was supported by sufficient evidence means any error was harmless beyond a reasonable doubt); *State v. Ramos*, 8th Dist. Cuyahoga No. 103596, 2016-Ohio-7685, ¶ 14-15; *State v. Franks*, 8th Dist. Cuyahoga No. 103682, 2016-Ohio-5241, ¶ 18.

{¶13} We summarily reject Moton's argument that there was insufficient evidence to prove that he possessed a weapon while under disability in violation of R.C. 2923.13(A)(3). That offense prohibits a person from using or carrying a firearm if, among other things, the person has been convicted of trafficking in any drug of abuse. Moton stipulated to a prior conviction for drug trafficking, and the evidence supporting the aggravated murder count proved that he possessed a weapon. *State v. Knowles*, 10th Dist. Franklin No. 16AP-345, 2016-Ohio-8540, ¶ 30.

## B. Manifest Weight of Evidence

{¶14} In the fourth assignment of error, Moton complains that the court's verdict is against the manifest weight of the evidence. He argues that no witness identified him as

the shooter, that the witnesses gave conflicting testimony when describing the truck used by the shooter, and that he could not be linked to the murder weapon.

{¶15} The manifest weight of the evidence standard requires the reviewing court to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Otten*, 33 Ohio App.3d 339, 340, 515 N.E.2d 1009 (9th Dist.1986). This is a difficult burden for an appellant to overcome because the trier of fact has the sole responsibility to resolve factual issues. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Because the standard of review uses the word "manifest," it means that we can only reverse the trier of fact if its decision is very plainly or obviously contrary to the evidence.

{¶16} When issuing its verdict, the court said, "I will say this: I don't know that I've ever had a case with such consistent witness testimony. The witnesses were very consistent." Indeed, the case came together rather easily for the state. With evidence that Moton's truck and cell phone appeared to disappear following the murder, the court could infer that Moton bought and used them specifically to facilitate the murder. Not only was Moton in communication with the victim just prior to the murder, he was placed at the scene of the crime because his DNA was found on the victim's car. Moton argued that his DNA likely found its way on the door handle because he worked at a car wash

where the victim's car had been cleaned. The court rejected this theory, noting that Moton offered no proof that he actually worked at the car wash. In addition, the court thought it unlikely that Moton's fingerprints would have survived the car wash itself (as argued by Moton), and noted that Moton contradicted his own argument by claiming at trial that rain occurring near the time of the shooting would have compromised the DNA evidence found on the door handle. In any event, the DNA evidence was compelling: a forensic analyst testified and described the DNA match as "beautiful."

{¶17} It is true that witnesses gave varying descriptions of the vehicle used by the shooter. The state's case, however, did not depend on descriptions of the truck itself. The DNA evidence placed Moton at the scene of the crime. Phone records showed that the victim had been in contact with a person called "Floyd" shortly before the murder. Records from the Bureau of Motor Vehicles confirmed that Moton had very recently registered a truck that matched a description given by one witness to the shooting, surveillance footage showed that same type of truck had been seen circling the area shortly before the murder occurred. This evidence made discrepancies in witness descriptions of the vehicle largely immaterial. The court did not lose its way by finding Moton guilty of aggravated murder.

## II. Public Trial

{¶18} During the cross-examination of the second state witness, the court stopped testimony to ask a spectator "what case are you here for?" When the spectator told the court it was for the "Moton case," the court told the spectator to "step out." The court

then identified a man and woman in the courtroom and likewise asked them what they were there for — they, too, replied, "the Moton case." The court said, "I asked the State to limit it to three people and there's no in and out when I'm in session. Please step outside. I would appreciate it if you tell these people that I am going to keep doing this, and if I have to keep doing it, there's going to be a problem." Moton complains that the court's actions violated his right to a public trial.

{¶19} "The right to a public trial is guaranteed by the Sixth Amendment to the United States Constitution and by Section 10, Article I of the Ohio Constitution." *State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 81. And the violation of the right to a public trial is structural error that "is not subjected to harmless-error analysis." *Id*. Because the right is structural, "it cannot be waived by the defendant's silence." *Id*.

{¶20} The right to a public trial is not absolute and can yield to other interests, such as the court exerting "authority to exercise control over the proceedings and the discretion to impose control over the proceedings." *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 51. As part of its authority to exercise control over "all proceedings in a criminal trial," R.C. 2945.03, the court has "discretion to order the exclusion of spectators" so long as "it does not inappropriately deny the defendant's right to a public trial." *State v. Morris*, 157 Ohio App.3d 395, 2004-Ohio-2870, 811 N.E.2d 577, ¶ 13 (1st Dist.). *See also State v. Sowell*, 10th Dist. Franklin No. 06AP-443, 2008-Ohio-3285, ¶ 34.

**{¶21}** The trial transcript shows that the movement of certain spectators in the courtroom had become disruptive to the trial judge: "I asked the State to limit it to three people and there's no in and out when I'm in session." The movement of people in and out of the courtroom was a legitimate concern. The trial judge may not have known if the people entering the courtroom were witnesses who could be subject to a separation of witnesses. This case was tried to the court, so the constant monitoring of people entering the courtroom in the middle of witness testimony would have been particularly distracting. It was likely for this reason that the trial judge told the state that "I would appreciate it if you tell these people that I am going to keep doing this, and if I have to keep doing it, there's going to be a problem." This comment indicated that the trial judge was not excluding the public from the courtroom, but only asking these persons to refrain from entering and exiting the courtroom so that the trial judge could maintain control over the courtroom. This was a reasonable course of action and well within the trial judge's discretion: "the right to a public trial is not absolute and an order barring spectators from observing a portion of an otherwise public trial does not necessarily introduce error of constitutional dimension." *State v. Whitaker*, 8th Dist. Cuyahoga No. 83824, 2004-Ohio-5016, ¶ 11. *See also State v. Bragg*, 10th Dist. Franklin No. 05AP-100, 2006-Ohio-1903, ¶ 24; *State v. Brown*, 8th Dist. Cuyahoga No. 73060, 1998 Ohio App. LEXIS 5589, 4 (Nov. 25, 1998).

**{¶22}** Notwithstanding the well-written dissent, it would be hyperbole to suggest that stopping three people from entering the courtroom in the middle of a witness's

testimony is equivalent to "closing" the trial to the public. There is nothing in the record that indicates whether other spectators were in the courtroom, but the specificity with which the court described two of the removed spectators suggests that there were others present. For this reason, this case is distinguishable from *Bethel*, where the facts make it clear that the proceeding — a hearing where a plea agreement was discussed — was *entirely* "closed to the public." *Bethel,* 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, at ¶ 80.

**{¶23}** Even if ordering the three people to leave the courtroom somehow implicated Moton's Sixth Amendment right to a public trial, the "triviality standard" would apply to bar any finding of error.

**{¶24}** This standard is not a harmless error standard, but "looks, rather, to whether the actions of the court and the effect that they had on the conduct of the trial deprived the defendant — whether otherwise innocent or guilty — of the protections conferred by the Sixth Amendment." *Peterson v. Williams*, 85 F.3d 39, 42 (2d Cir.1996). *See also Sowell*, 10th Dist. Franklin No. 06AP-443, 2008-Ohio-3285, at ¶ 43. The "protections" conferred by the Sixth Amendment guarantee of a public trial are to "safeguard against any attempt to employ our courts as instruments of persecution." *In re Oliver*, 333 U.S. 257, 270, 68 S.Ct. 499, 92 L.Ed. 682 (1948).

**{¶25}** The limited record of the proceedings provides no basis for finding that the trial judge's actions implicated the primary protections conferred by the right to a public trial. There record does not show, and Moton does not argue, that the trial judge barred

all spectators or members of the public from the courtroom — just the three. A Sixth Amendment violation did not occur.

### III. Hearsay

{¶26} During trial, a police officer testified to statements made to her by an eyewitness to the shooting. The police officer testified that a witness (the person who called 911 to report the shooting) said that she observed a male get out of an SUV, open the passenger door, and fire three to four rounds into the car. Moton complains that these statements were inadmissible hearsay.

{¶27} Moton did not object to the statements, so we review them for plain error. *State v. Jalowiec*, 91 Ohio St.3d 220, 233, 2001-Ohio-26, 744 N.E.2d 163. No plain error exists.

{¶28} It is unclear why Moton believes this testimony was prejudicial. It did not identify him as the shooter, nor did it contain any facts that were not independently verifiable by physical evidence. Viewed this way, the police officer's testimony fell under the well-established rule that "extrajudicial statements made by an out-of-court declarant are properly admissible to explain the actions of a witness to whom the statement was directed." *State v. Thomas*, 61 Ohio St.2d 223, 232, 400 N.E.2d 401 (1980); *State v. Phillips*, 8th Dist. Cuyahoga No. 104806, 2017-Ohio-1284, ¶ 46. The police officer testified that after learning what the witness saw, she brought the witness to her police supervisor for further questioning. Her testimony thus explained the actions

she took when investigating the murder. The statements were properly admitted on that basis.

**{¶29}** In any event, the witness later testified at trial and confirmed the contents of the 911 call she made to the police and that she gave the police officer information about the events she witnessed. This testimony was consistent with the police officer's testimony. Moton subjected the witness to cross-examination, so any error in admitting the hearsay statements by the witness was rendered harmless. *State v. Tomlinson*, 33 Ohio App.3d 278, 281, 515 N.E.2d 963 (12th Dist.1986); *State v. Bidinost*, 8th Dist. Cuyahoga No. 62925, 1993 Ohio App. LEXIS 3097, 18 (June 17, 1993).

**{¶30}** Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MELODY J. STEWART, JUDGE

KATHLEEN ANN KEOUGH, P.J., CONCURS;
MARY J. BOYLE, J., DISSENTS IN PART AND CONCURS IN JUDGMENT IN PART (WITH SEPARATE OPINION ATTACHED)

MARY J. BOYLE, J., DISSENTING IN PART AND CONCURRING IN JUDGMENT IN PART:

{¶31} I respectfully dissent with respect to Moton's first assignment of error. It is my view that the trial court's decision to exclude at least three people — and possibly countless more — from the courtroom during Moton's trial violated his Sixth Amendment right to a public trial. I say "possibly countless more" because the trial court instructed the three spectators to warn others who were outside the courtroom that "there's no in and out" when court was in session — effectively closing the courtroom to anyone else who wished to enter. The trial court further indicated that it told the prosecutor to limit its spectators to three people. Without considering any of the four factors required under *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), this apparent "policy" of the trial court is unacceptable.

{¶32} The right to a public trial has its roots in our English common law heritage. *In re Oliver*, 333 U.S. 257, 266, 68 S.Ct. 499, 92 L.Ed. 682 (1948), citing Radin, *The Right to Public Trial*, 6 Temp.L.Q. 381-384. This right "likely evolved long before the settlement of our land as an accompaniment of the ancient institution of [a] jury trial." *Id.*

{¶33} Today, few people look back fondly on 18th-century criminal justice. Capital and corporal punishments, such as whipping and the stocks, were commonplace. Women and minorities were excluded from a system run by white men. These criticisms, while important, obscure a key virtue that we have lost: "[o]rdinary citizens

regularly saw criminal justice at work and took part in it." Stephanos Bibas, *Essay: Transparency and Participation in Criminal Procedure*, 81 N.Y.U.L.Rev. 911, 918 (2006). Indeed, in colonial America:

> Ordinary citizens regularly watched [criminal] trials, and gossip about the trials quickly spread through small colonial communities. Everyone could witness punishment in the town square, as convicts swung from the scaffold or languished in the stocks. In short, layman participated in most criminal cases and routinely saw criminal justice first-hand.
>
> * * *
>
> The visible, public aspect of trials and punishment was essential to this scheme. The Sixth Amendment guaranteed local, public trials, which were fast and simple enough that viewers could understand them. * * * [C]olonists prized public trials as a safeguard for [a democratic] government. Public trials helped citizens to learn their rights and duties, bring relevant information to court, monitor government agents, prevent judicial corruption and favoritism, and check witness perjury. They also satisfied the public that truth had prevailed at trial, increasing public confidence in the system. Villages were small, and many locals knew the victims, the defendants, and what was happening in court.

*Id.* at 918, 920.

{¶34} Today, however, most people do not attend criminal trials. Indeed, the vast majority of people probably never step inside a courtroom. Instead, members of the public who want to view a criminal proceeding do so because of real events in their community that have affected them or their loved one. Thus, most criminal court audience members are not there by choice. Rather, they are there for matters that are beyond their control. They are the people who wait in lines and fill courtrooms to watch cases that they or their friends, family, or community members appear as victims, defendants, or witnesses to a crime.

**{¶35}** It is my view that the constitutional guarantee of a public trial is now more important than ever because often times people arrested for crimes in the United States "are overwhelming poor people of color, predominantly African Americans and Latinos." Jocelyn Simonson, *Article: The Criminal Court Audience in a Post-Trial World*, 127 Harv.L.Rev. 2173, 2177 (2014) (arguing that the constitutional right to a public trial is even "more important than it has been in centuries past" due to the fact that "about ninety-five percent of criminal convictions result from pleas"). Victims, too, disproportionately come from the same communities. *Id.* Thus, the community members attempting to gain access to a criminal proceeding are also more likely to be from the same poor communities, which are "disproportionately affected by, but have little input into, local criminal justice policies." *Id.*

**{¶36}** The open processes of justice serve "an important prophylactic purpose in our society, providing an outlet for community concern, hostility, and emotion." *Richmond Newspapers v. Virginia*, 448 U.S. 555, 571, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). This "crucial prophylactic" aspect of the "administration of justice cannot function in the dark; no community catharsis can occur if justice is 'done in a corner [or] in any covert manner.'" *Id.* "To work effectively, it is important that society's criminal process 'satisfy the appearance of justice,' and the appearance of justice can best be provided by allowing people to observe it." *Id.* at 572, quoting *Offutt v. United States,* 348 U.S. 11, 75 S.Ct. 11, 99 L.Ed. 11 (1954).

> "Without publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account. Recordation, appeal,

whatever other institutions might present themselves in the character of checks, would be found to operate rather as cloaks than checks; as cloaks in reality, as checks only in appearance."

*Richmond Newspapers* at 569, quoting 1 J. Bentham, *Rationale of Judicial Evidence* 524 (1827).

{¶37} To be sure, "audience members in a criminal courtroom watch the players in the room; they react to what they see and hear through facial expressions, laughs, and grumbles."  Simonson, 127 Harv.L.Rev. at 2182.  Most of all, they sit, watch, and listen.  Simply by being there and listening, audience members can have a "palpable effect" on the speakers in the courtroom.  *Id.*  The criminal court audience has the potential to play out "one of the central historical functions" of observers in adjudication, i.e., denying the government "'unchecked authority.'"  *Id.*, quoting Judith Resnik & Dennis Curtis, *Representing Justice* 300, 302 (2011).  As Justice Harlan observed nearly two decades before *Waller*:

> "Essentially, the public-trial guarantee embodies a view of human nature, true as a general rule, that judges, lawyers, witnesses, and jurors will perform their respective functions more responsibly in an open court than in secret proceedings.  A fair trial is the objective, and a public trial is an institutional safeguard for attaining it."

Daniel Levitas, *Scaling Waller: How Courts Have Eroded the Sixth Amendment Public Trial Right*, 59 Emory L.J. 493, 503 (2009), quoting *Estes v. Texas*, 381  U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (Harlan, J., concurring).

{¶38} The criminal court audience has power that stems from simply being in the courtroom.   This power is "bolstered by its ability to act based on what it hears: not only

through voting for politicians, judges, and prosecutors, but also by contributing to public discourse at local gatherings, protests, or even in conversations with neighbors." Simonson, 127 Harv.L.Rev. at 2177. By witnessing criminal trials, members of the audience learn about "the efficacy and fairness of those policies." *Id*. These informal methods of political participation are essential to our criminal justice system. Indeed, it is members of the public who hold the players in our criminal justice system accountable.

{¶39} I could not agree more with the Ohio Supreme Court that the right to a public trial is a "cornerstone of our democracy" that "should not be circumvented unless there are extreme overriding circumstances." *State v. Lane*, 60 Ohio St.2d 112, 119, 397 N.E.2d 1338 (1979). It is also important to remember that the right to "a public trial is for the benefit of the accused," so "that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." *Waller*, 467 U.S. at 46, 104 S.Ct. 2210, 81 L.Ed.2d 31, quoting *Gannett Co. v. DePasquale*, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979).

**I. Waiver**

{¶40} Before turning to the merits of Moton's assignment of error, I would first address a procedural issue that was raised by the state but was not discussed by the majority. The state argues that Moton waived his right to a public trial by not objecting to the closure of the courtroom. The state's argument raises an interesting issue because the Ohio Supreme Court has seemingly adopted different approaches to it in *State v.*

*Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150 and *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038.

{¶41} In *Bethel*, the appellant argued that he was entitled to a new hearing because the trial court prohibited the public from entering the courtroom when the parties discussed the plea agreement. *Id.* In its opinion, the court stated that "[a]lthough Bethel did not object to the closing of the hearing, the right to a public trial under Section 10, Article I of the Ohio Constitution cannot be waived by the defendant's silence." *Id.* at ¶ 81, citing *State v. Hensley*, 75 Ohio St. 255, 79 N.E. 462 (1906). Accordingly, the court considered appellant's assignment of error.

{¶42} Exactly two weeks later, however, in *Drummond*, the Ohio Supreme Court adopted what seems to be the opposite approach. In that case, the trial court decided to close the proceedings for the rest of the day to all members of the public except the media following a few disruptive incidents. The appellant objected, but the trial court overruled the objection. The next day, the trial court, again, ordered that the courtroom be cleared of all spectators except the media. This time, however, the appellant did not object. On review, the Ohio Supreme Court noted that "[t]he violation of the right to a public trial is considered structural error and not subject to harmless-error analysis" and found that the closure on the former day was appropriate under the *Waller* factors. *Id.* at ¶ 50, citing *Waller*. As to the latter day of trial, however, and despite its earlier statements concerning structural error, the court declined to review the closure, finding that the appellant had waived his right to a public trial. Specifically, the court noted that

"the defense did not object to the trial court's action. Defense counsel were present during the entire proceedings and were fully aware of the exclusion of the spectators from the courtroom. Thus, counsel's failure to object to the closing of the courtroom constitutes a waiver of the right to a public trial[.]" *Id.* at ¶ 59.

{¶43} *Bethel* and *Drummond* have rendered confusion in Ohio appellate courts, who seemingly have felt the need to adopt one case's holding over the other based on their contrary approaches to a defendant's failure to object. Some, including the Second, Ninth, and Tenth districts, continue to follow *Bethel*, holding that the defendant's failure to object to the closure of the courtroom does not waive the issue on appeal. In *State v. Sowell*, 10th Dist. Franklin No. 06AP-443, 2008-Ohio-3285, the Tenth District refused to follow *Drummond*, finding that "the Supreme Court of Ohio has more recently held that the right to a public trial cannot be waived by silence." *Id.* at ¶ 36. While it is my opinion that the Tenth District's reasoning was flawed — *Bethel* actually pre-dated *Drummond* by two weeks — the court ultimately found that the appellant did not waive his right to a public trial by not objecting. In *State v. Belcher*, 2d Dist. Montgomery No. 24968, 2013-Ohio-1234, the Second District followed *Sowell*, stating:

> In view of these facts, we would normally conclude that Belcher waived the right to challenge the trial court's action by failing to object. After Drummond was issued, however, the Tenth District Court of Appeals noted that "the Supreme Court of Ohio has more recently held that the right to a public trial cannot be waived by silence." *State v. Sowell*, 10th Dist. Franklin No. 06AP-443, 2008-Ohio-3285, ¶ 36, citing *State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 81.

*Id.* at ¶ 64. Further, in *State v. Williams,* 9th Dist. Summit No. 26014, 2012-Ohio-5873, the Ninth District plainly chose to follow *Bethel* instead of *Drummond*. *Id.* at ¶ 7.

**{¶44}** This court, on the other hand, followed *Drummond* in *State v. Bolan*, 8th Dist. Cuyahoga No. 95807, 2011-Ohio-4501. In *Bolan*, the appellant argued that the trial court's closure of the courtroom during two witnesses' testimony violated his right to a public trial. We disagreed, finding that the appellant waived that right when he affirmatively consented to the trial court's decision to close the proceedings for one witness's testimony and actually requested that the trial court close the proceedings during a separate witness's testimony. *Bolan* at ¶ 65. Therefore, we found that the appellant waived his right and overruled his assignment of error. *Id.* at ¶ 67.

**{¶45}** After a thorough examination of *Bethel*, *Drummond*, and lower appellate decisions, I would find that the Ohio Supreme Court's decisions may be reconciled. *Bethel*'s holding that the right to a public trial may not be waived by silence was arguably not implicated in *Drummond* because there, the appellant was not silent, objecting to the trial court's closure during one day of the trial. *Drummond*'s holding may not actually undermine *Bethel* by instead allowing the waiver of the right to a public trial when a party fails to renew an objection over a courtroom closure. In other words, the failure to renew an objection to the closure is proof that a defendant consented to the closure. *See State v. Williams*, 9th Dist. Summit No. 26014, 2012-Ohio-5873, ¶ 7. In that light, *Bethel* is still good law and stands for the proposition that a defendant's silence is not evidence that a defendant consents to or waives the issue of closure.

**{¶46}** Nevertheless, this court's previous holding in *Bolan* must still be addressed. I would find that our reference to *Drummond* in *Bolan* was merely dicta, because the facts in that case clearly showed that the appellant not only did not object during the proceedings but affirmatively waived his right during one witness's testimony and actually requested that the courtroom be closed during another witness's testimony. Specifically, we noted, "With respect to Olgetree, defense counsel consented to the closure and acknowledged that Bolan waived any prejudice by the courtroom being emptied at the time Ogletree testified. With Smiley, defense counsel requested that the courtroom be closed during his testimony." *See Bolan* at ¶ 65. Hence, our observation that "the defense did not object to the closure" and citation to *Drummond* was unnecessary because defendants are permitted to waive their right to a public trial. Further, *Bolan* did not implicate *Bethel* because, like the appellant in *Drummond*, the appellant was anything but silent on the issue of closure, actively waiving the issue for appellate review.

**{¶47}** In this case, Moton did not object or make any statements in regard to the closure. In other words, he was completely silent. In light of the above discussion, I would therefore find both *Drummond* and *Bolan* to be distinguishable and *Bethel* to be controlling, and in accord with *Bethel*, I would reject the state's argument and find that Moton's failure to object to the trial court's order did not waive his right to a public trial and the issue is properly before this court.

**II. Merits**

**{¶48}** The record demonstrates that the trial court violated Moton's right to a public trial during the cross-examination of Officer Saffo. During that testimony, an unidentified individual entered the courtroom, and the following exchange took place:

COURT: Excuse me. What case are you here for?

SPECTATOR: The Moton case.

COURT: Step out. Lady in the hat and the man in the back, what case are you here for?

SPECTATOR: This one.

COURT: Okay. I asked the State to limit it to three people and there's no in and out when I'm in session. Please step outside. I would appreciate it if you tell these people that I am going to keep doing this, and if I have to keep doing it, there's going to be a problem. Go ahead.

**{¶49}** In support of its holding that Moton's right to a public trial was not violated, the majority states, "The limited record of the proceedings provides no basis for finding that the trial judge's actions implicated the primary protections conferred by the right to a public trial." The majority supports that conclusion by arguing that (1) the trial judge was merely controlling her courtroom and not required to make the necessary findings under *Waller*, (2) the ordering of three spectators was not a "closure," and, (3) even if Moton's right to a public trial were implicated, the triviality standard would apply and result in no error. I disagree with all of these points.

**{¶50}** First, it is my view that the trial court's order removing the spectators without making any findings, even if to control its courtroom, is contrary to *Waller*, 467 U.S. 39, 45, 104 S.Ct. 2210, 81 L.Ed.2d 31. These findings must be made regardless of

whether the closure is full or partial. *See Drummond,* 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, at ¶ 53 (holding that a court is still required to make the *Waller* findings when partially closing its court proceedings).

{¶51} The majority is correct that the right to a public trial is not absolute and must sometimes yield to administer justice and control courtroom proceedings. *Drummond* at ¶ 51; *see also State v. Sowell*, 148 Ohio St.2d 554, 2016-Ohio-8025, 71 N.E.3d 1034, ¶ 28 (holding that the right to a public trial may sometimes "give way * * * to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information."). A trial court certainly has the discretion and authority to control its proceedings. *State v. Sowell*, 10th Dist. Franklin No. 06AP-443, 2008-Ohio-3285, ¶ 34; *State v. Adkins*, 144 Ohio App.3d 633, 643, 761 N.E.2d 94 (12th Dist.2001). "A trial court * * * may exclude those courtroom spectators whose conduct is likely to interfere with the administration of justice or to denigrate the protection of public health, safety, and morals." *Sowell* at ¶ 34, citing *State v. Grant*, 8th Dist. Cuyahoga No. 87556, 2007-Ohio-1460.

{¶52} Nevertheless, a defendant's right to a public trial cannot be freely bypassed by a trial court's ability to control its courtroom. In fact,

> [t]he presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

*Waller* at 45, quoting *Press-Ent. Co. v. Superior Court of California, Riverside Cty.*, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984). In other words, a trial court's order excluding spectators must be "reasonable and necessary" and not unduly infringe on a defendant's right to a public trial. *Adkins* at 642-643, citing *State v. Bayless*, 48 Ohio St.2d 73, 357 N.E.2d 1035 (1976); *see also State v. Dubose*, 174 Ohio App.3d 637, 2007-Ohio-7217, 884 N.E.2d 75, ¶ 72 (7th Dist.) ("[A] trial may only be closed when deemed absolutely necessary").

{¶53} This court has reviewed whether a trial court's order excluding the public from its proceedings — "closure" — was reasonable and necessary by using the four-part test set forth in *Waller*. *See State v. Driggins*, 8th Dist. Cuyahoga No. 98073, 2012-Ohio-5287, ¶ 53; *State v. Woods*, 8th Dist. Cuyahoga Nos. 94141 and 94142, 2011-Ohio-817, ¶ 10; *State v. Cottrell*, 8th Dist. Cuyahoga No. 81356, 2003-Ohio-5806, ¶ 18-22; *State v. Washington*, 142 Ohio App.3d 268, 271, 755 N.E.2d 422 (8th Dist.2001). In *Waller,* the United States Supreme Court set forth the following test to determine if a courtroom closure was necessary:

> [1] the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced; [2] the closure must be no broader than necessary to protect that interest; [3] the trial court must consider reasonable alternatives to closing the proceeding; and [4] [the trial court] must make findings adequate to support the closure.

*Id.* at 48. More recently, in accordance with the Ohio Supreme Court's holding in *Drummond*, Ohio courts have adopted an altered version of the *Waller* test when the closure was only partial in nature. *See State v. Howse*, 9th Dist. Lorain No.

12CA010251, 2012-Ohio-6106, ¶ 7*; Bolan*, 8th Dist. Cuyahoga No. 95807, 2012-Ohio-2381, at ¶ 7; *State v. Breedlove*, 7th Dist. Mahoning No. 05 MA 110, 2008-Ohio-1550, ¶ 83. For closure to be appropriate under that test, the party seeking closure must advance a "substantial reason," rather than an "overriding interest." *See id*. The remaining factors are the same and must be satisfied as well for a partial closure to be proper.

{¶54} While this court has distinguished between total and partial closure in the past and used the different tests, I find it unnecessary to make that distinction in the present case because the remaining factors were clearly not satisfied. In *Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, the court did not discuss whether the closure was partial or total in nature because "the record in [that] case [did] not show that any of the[] requirements were addressed." *Id*. at 429.

{¶55} The majority cites and relies upon *State v. Morris*, 157 Ohio App.3d 395, 2004-Ohio-2870, 811 N.E.2d 577 (1st Dist.). It is my view, however, that this case actually demonstrates that the trial court's closure in the present case was error because it did not make the necessary findings under *Waller*. In *Morris*, the trial court "asked a female to leave the courtroom before ordering the removal of 'all those people.'" *Id.* at ¶ 15. On review, the First District noted that the "record [did] not indicate the identity of the persons who were subject to the court's removal order or whether the courtroom was cleared of all spectators" and "the record is silent as to any conduct that would have prompted the removal order[.]" *Id.* The First District explained that "[t]he trial court's

actions in ordering the removal of certain individuals may well have been warranted and entirely appropriate due to disruptive conduct that impeded an overriding interest in the court's orderly administration of its docket." *Id.* at ¶ 16. But it found that because the trial court did not make the necessary findings, the defendant's right to a public trial was violated. *Id.* It reasoned that "on the record before us, we cannot say that the removal of some or all of the spectators was necessary to protect an overriding interest, that there were no viable alternatives to the removal, or that the order was narrow enough to protect only an overriding interest." *Id.*; *see also State v. Clifford*, 135 Ohio App.3d 207, 214, 733 N.E.2d 621 (1st Dist.1999) ("We hold that the trial court's conclusory order for the spectators to leave the courtroom does not provide us with a sufficient rationale for total closure of the courtroom.").

{¶56} *Bethel* and *Morris* make it clear that removing the spectators from the courtroom violated Moton's right to a public trial because the trial court utterly failed to (1) ensure that the closure was no broader than necessary, (2) determine that there were no reasonable alternatives, and (3) make adequate findings on the record.

{¶57} Even further, the record shows that only one of the spectators — the spectator initially addressed by the judge — entered during the testimony. The record does not establish that the other two spectators who were removed — the "lady in the hat and the man in the back" — entered during Officer Safo's testimony. In other words, even if the trial court had stated on the record that it was closing the courtroom to prevent disruption, nothing in the record shows that the "lady in the hat and the man in the back"

entered during the testimony or caused any type of disruption. The majority's conclusion that all three spectators were distracting is not supported by anything in the record.

{¶58} Second, I disagree with the majority that the ordering of three spectators was not a "closure." A trial court need not remove all of the spectators from the courtroom for that removal to constitute a closure; instead, as recognized by this court and other Ohio courts many times, a closure can be partial in nature. *See State v. Long*, 10th Dist. Franklin No. 16AP-708, 2017-Ohio-9322, ¶ 22 (finding that the removal of certain spectators constituted partial closure and required an analysis under *Waller*); *Grant*, 8th Dist. Cuyahoga No. 87556, 2007-Ohio-1460, at ¶ 15 (finding that the trial court's removal of two spectators from the courtroom during a witness's testimony implicated the appellant's right to a public trial); *Dubose*, 174 Ohio App.3d 6, 2007-Ohio-7217, 884 N.E.2d 75, at ¶ 76 (finding that the removal of some of the spectators, but not members of the media, constituted closure and needed to satisfy the *Waller* factors). And, as already stated above, when a partial closure occurs, the trial court must make the necessary findings under *Waller*. *See State v. Cottrell*, 8th Dist. Cuyahoga No. 81356, 2003-Ohio-5806, ¶ 24; *United States v. Simmons*, 797 F.3d 409, 413-414 (6th Cir.2015).

{¶59} Finally, the majority holds that even if Moton's right to a public trial were implicated — which I believe that it was — "the 'triviality standard' would apply to bar any finding of error."

{¶60} Foremost, "[t]he violation of the right to a public trial is a structural error. It is not subject to harmless-error analysis." *Bethel*, 110 Ohio St.3d 416,

2006-Ohio-4853, 854 N.E.2d 150, at ¶ 82, citing *Waller*; *see also State v. Hill*, 92 Ohio St.3d 191, 199, 749 N.E.2d 274 (2001) (holding that structural errors are those that "are so fundamental that they obviate the necessity for a reviewing court to do a harmless-error analysis."); *Johnson v. Sherry*, 586 F.3d 439, 443 (6th Cir.2009) ("Because of the great, though intangible, societal loss that flows from closing courthouse doors, the denial of a right to a public trial is considered a structural error for which prejudice is presumed."). A structural error "affect[s] the framework within which the trial proceeds," and is more than "simply an error in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Thus, I disagree that the trial court's error was trivial.

{¶61} Furthermore, the triviality standard should be narrowly applied. *United States v. Gupta*, 699 F.3d 682, 687 (2d Cir.2011). It only applies when a courtroom closing does not implicate the values contemplated by the Sixth Amendment, which include "ensur[ing] that judge and prosecutor carry out their duties responsibly * * * [and] discourag[ing] perjury." *United States v. Perry*, 479 F.3d 885, 890-891 (D.C.Cir.2007). The cases that utilize the triviality standard and that are relied on by the majority are both nonjurisdictional and distinguishable. In *Peterson v. Williams*, 85 F.3d 39 (2d Cir.1996), the court found that the violation of the defendant's right to a public trial was trivial because it was "(1) extremely short, (2) followed by a helpful summation, and (3) entirely inadvertent[.]" *Id.* at 44. In *Sowell*, 10th Dist. Franklin No. 06AP-443, 2008-Ohio-3285, the Tenth District found that the trial court properly removed one of the

defendant's family members from the courtroom for making threatening gestures towards a witness. *Id.* at ¶ 46. In both of those cases, it was clear that the short, inadvertent courtroom closure and the removal of a disruptive spectator did not impede the values served by the Sixth Amendment.

{¶62} The Second Circuit, however, reached a different conclusion in *Gupta.* There, "despite not making any *Waller* findings, the district court intentionally excluded the public from the courtroom for the entirety of *voir dire.*" *Id.* at 687. The court held that "a trial court's intentional, unjustified closure of a courtroom during the entirety of *voir dire* cannot be deemed 'trivial.'" *Id.* at 689. The court reiterated the importance of the right to a public trial and found that to classify such closure as trivial "would eviscerate [that] right entirely." *Id.*

{¶63} Here, the trial court's closure was not inadvertent, there is no evidence showing how long the closure occurred, how many spectators (beyond the three removed) were affected, whether the removed spectators (and possibly others) were ever allowed back inside the courtroom, and there is no evidence that any of the removed spectators were disruptive. In fact, like *Gupta*, the trial court's actions here, as demonstrated by the record, and particularly in relation to the "lady in the hat and the man in the back," were entirely unjustified. Therefore, it is my view that the majority's reliance on the triviality standard is misplaced.

{¶64} In sum, allowing a trial judge to close the courtroom without setting forth the necessary findings as required by *Waller*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d

31, sets forth a dangerous precedent. It would allow a trial judge to eviscerate a defendant's constitutional right to a public trial by not explaining themselves and calling it "courtroom control." There would be no way of telling whether a trial court's "courtroom control" was an abuse of discretion and violation of a defendant's constitutional right to a public trial because trial judges would no longer be required to set forth the required findings on the record. *See Presley v. Georgia*, 558 U.S. 209, 215, 130 S.Ct. 721, 175 L.Ed.2d 675 (2010), quoting *Press-Ent. Co.,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (holding that before closing courtroom proceedings, "the particular interest, and threat to that interest, must 'be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.'"). This is not what *Waller* requires, and departing from clearly established Supreme Court precedent does nothing to assist in the furtherance of justice and the protection of constitutional rights. Instead, it robs Moton of his constitutional right to a public trial.

{¶65} When a trial court improperly closes its proceedings during trial in violation of a defendant's right to a public trial, an appellate court must remand the case for a new trial. *See Woods*, 8th Dist. Cuyahoga Nos. 94141 and 94142, 2011-Ohio-817, at ¶ 27; *Dubose*, 174 Ohio App.3d 637, 2007-Ohio-7217, 884 N.E.2d 75, at ¶ 123; *State v. Washington*, 142 Ohio App.3d 268, 273, 755 N.E.2d 422 (8th Dist.2001); *State v. Clifford*, 135 Ohio App.3d 207, 214, 733 N.E.2d 621 (1st Dist.1999). Therefore, I believe we have no choice but to reverse and remand the case for a new trial. In light of that holding, I would find that Moton's fourth assignment of error challenging the manifest weight of the evidence and his fifth assignment of error regarding hearsay are moot. But because a sufficiency challenge is never moot, I concur in judgment only with respect to the majority's opinion regarding Moton's second and third assignments of error.