[Cite as *State v. Long*, 2021-Ohio-2202.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 20AP-106 |
| v. | : | (C.P.C. No. 15CR-3564) |
| Michael Long, | : | (REGULAR CALENDAR) |
| Defendant-Appellee, | : | |
| [Margaret A. Long, | : | |
| Defendant-Appellant]. | : | |

D E C I S I O N

Rendered on June 29, 2021

**On brief:** [*G. Gary Tyack*], Prosecuting Attorney, and *Seth L. Gilbert*, for appellee State of Ohio.

**On brief:** *Carpenter Lipps & Leland LLP, Kort Gatterdam*, and *Erik P. Henry,* for appellant.

APPEAL from the Franklin County Court of Common Pleas

NELSON, J.

{¶ 1} This appeal comes to us in a somewhat unusual posture. Interpreting recent case law, the state agrees with defendant-appellant Margaret "Pebbles" Long that her (second) conviction for contempt of court should be reversed. Appellee's Brief at 6 ("reversal would be appropriate"). That agreement does not obviate the appeal: the trial court found Ms. Long guilty of contempt, and she wants that judgment overturned. Nor does the state's alignment with Ms. Long control the outcome, especially because the matter implicates the judicial department's inherent authority to regulate proceedings relating to a criminal trial.

{¶ 2}   For the reasons outlined below, we reject the argument of the state and Ms. Long that the trial court lacked authority to conduct the hearing it did to determine whether Ms. Long had violated its order to refrain from making threats against jurors, potential witnesses, and court personnel.  Under appropriate circumstances and constraints, a trial court—where the evidence warrants, and in accordance with due process—has the power to enforce a contempt order against making threats of violence to people involved in a criminal proceeding before that court. We further conclude, however, that the trial court erred in finding beyond a reasonable doubt on the evidence before it that Ms. Long had in fact contravened its no-threat order as properly construed.

{¶ 3}   For the most part, the facts of the matter are well described in the trial court's February 3, 2020 Decision and Entry that found Ms. Long guilty of contempt.  Ms. Long is the mother of Michael Long, who had returned before the Franklin County Common Pleas Court to be tried again for crimes including murder, kidnapping, aggravated robbery, and a weapons charge after this court had overturned his convictions from an earlier trial because the trial court had closed the courtroom during a portion of that trial.  *See* Feb. 3, 2020 Decision & Entry at 1-2, referencing *State v. Long*, 10th Dist. No. 16AP-708, 2017-Ohio-9322.

{¶ 4}   The case against Michael Long involved allegations that he and a friend nicknamed "Poncho" had broken into the home of the Bowles family to steal guns, tied up a Bowles son, and then engaged in a "melee" in which one Bowles family member was stabbed repeatedly, another was shot, and Poncho wound up dead. 2017-Ohio-9322, at ¶ 2. In any event, tensions between the Bowles and Long families seem to have run high.  Our decision remanding Michael Long's case for retrial reflects the first trial's highly charged atmosphere:  At the outset, after learning of a hallway altercation involving a member of the Bowles family, the trial judge had cautioned the courtroom audience to behave; with trial underway, one juror was excused after allegations that some unknown person associated with Michael Long had attempted to communicate with him; and the trial judge then closed the courtroom to the public out of a concern for protecting " 'the integrity of this trial.' "  *Id.* at ¶ 5, 7, and 9.

{¶ 5}   In the course of finding that the trial court had not established a " 'substantial reason' " for the partial closing, we noted that it had not considered alternatives to that

approach, *id.* at ¶ 25, 30, and 34; we held that closing to be structural error in violation of Michael Long's federal sixth amendment right to a public trial. *Id.* at ¶ 34.

{¶ 6} On the second go-round, and after further developments, the trial court did consider another approach. On July 12, 2018, in advance of trial as then scheduled for that September, the trial court issued an Order that more fully described the altercation from the first trial as having involved a "fight" "directly outside of the courtroom" between members of the Long and Bowles families, an affray "so widespread that deputy sheriffs had to intervene and physically separate those involved." July 12, 2018 Order at 1 (also noting the juror's account that "someone associated with [Michael] Long had attempted to contact" him). Now, the trial court stated, with the second trial approaching, it had become "aware of several social media postings made by Mr. Long's mother, [Margaret] Long, regarding the instant matter." *Id.* at 2. Such postings, the Order continued, included the phrase "Jurors yall next!"; the words "Judicial system" over "a picture of pointy-toed shoes with the caption 'when you're fully prepared' "; subpoenaed cell phone records of a witness "with her cell phone number clearly visible"; and "privileged [that is, at least previously privileged] attorney-client communication between Mr. Long and his attorney." *Id.* at 2-3.

{¶ 7} The Order further recited that, "concerned about the public posting[s] jeopardizing Mr. Long's right to a fair trial," the trial court had "conducted a status conference on the record on July 10, 2018" to express its concerns. *Id.* at 2. Counsel for Michael Long, "the Bowles family," Michael Long, and Michael Long's family "including his mother, [Margaret] Long" all were "present in the courtroom." *Id.* But that conference, the Order went on, "did not deter [Margaret] Long. Shortly after the hearing, she posted more content on her Facebook pages. * * * * [S]he has tagged members of the Bowles family in some of her postings." *Id.* at 3.

{¶ 8} Finding "both a clear and present danger and a serious and imminent threat to a fair trial," and given "the unique circumstances surrounding this litigation in combination with the multitude of alarming posts on social media," but also having considered alternatives and having concluded that closing the courtroom again or barring family members from the trial would not be appropriate or effective, the trial court ordered that: "Trial participants and their extended families (including but not limited to mothers, fathers, [etc.] * * * ) and/or persons acting in concert with [or at the behest or as agents of] trial participants and their families * * * are barred and prohibited from posting on social

media platforms of any type: (1) anything obtained during discovery of this case; (2) anything obtained through attorney-client communications; [and] **(3) any threats, whether express or implied, against current and former jurors, witnesses, attorneys and court personnel associated with this case**." *Id.* at 4-5 (emphasis added). The Order was "in effect until a verdict is reached in the September 24, 2018 trial," and was punishable by "a finding of contempt, a jail sentence, a monetary fine, criminal charges, or other sanctions the Court deems appropriate." *Id.* at 6.

{¶ 9} In the words of the trial court later, "[t]his Order still did nothing to deter Ms. Long." Feb. 3, 2020 Decision & Entry at 3. After a show cause hearing at which she was represented by counsel, she was found guilty of contempt for violating the Order in some way and was sentenced to 20 days in jail. Oct. 3, 2018 Order (also extending the July 12, 2018 Order "until the conclusion of [Michael Long's] trial"). Ms. Long did not appeal from that first contempt adjudication and it is not directly before us.

{¶ 10} The underlying case then passed to a different judge. In the fullness of time, the state requested further contempt citations against Ms. Long. Another assigned judge studied the matter and determined to proceed with a show cause hearing. Jan. 15, 2020 Decision & Entry Denying Dismissal of the Motion to Show Cause. The trial court rejected Ms. Long's argument that she could not be found in indirect contempt because she was not a party to the underlying case in which the July 12, 2018 Order issued. *Id.* at 5-7, 8 citing *Beaver Excavating Co. v. Perry Twp.*, 79 Ohio App.3d 148, 152 (5th Dist.1992); *Planned Parenthood Assn. of Cincinnati v. Project Jerico*, 52 Ohio St.3d 56 (1990); *Blasi v. United Debt Servs.*, S.D.Ohio No. 2:14-cv-083, 2017 U.S. Dist. Lexis 121537 (Aug. 2, 2017). Ms. Long, after all, had actual knowledge of the relevant Order, having been apprised of it in open court and having previously been found guilty and sentenced for violating its terms. *Compare* Jan. 15, 2020 Decision & Entry at 5-6, 8 (citing Civil Rules 65 and 71). The trial court also rebuffed Ms. Long's arguments that the court could not hold her in contempt without a grand jury indictment and a jury trial, noting that "jail penalties of the duration faced by one accused of contempt do not rise to the level" requiring such procedures. *Id.* at 9 (citation omitted). Nor did the trial court buy Ms. Long's contention that it needed to appoint an independent prosecutor before proceeding. *Id.*

{¶ 11} The trial court did express understandable reservations about the reach of the first two prongs of the July 12, 2018 Order, which it viewed as prohibiting expression to

Ms. Long in which another "concerned citizen could legitimately" engage. *Id.* at 10. "Ms. Long certainly raises a legitimate argument here. But no one * * * would be permitted to make ***threats*** to witnesses, jurors, etc." *Id.* (emphasis in original). The trial court then deemed those first two prohibitions from the July 12, 2018 Order irrelevant, "because they will not apply" to the show cause hearing the court established: "For purposes of that hearing," the trial court "is only interested in, and will only apply, subsection (3) of the Order to the allegations of contempt." *Id.*

{¶ 12} The trial court conducted the show cause hearing on January 21, 2020, accepting stipulated evidence and hearing argument from counsel. (Counsel disclosed at that hearing, among other things, that Margaret Long herself had not been involved in the hallway fight during the first trial, Jan. 21, 2020 Tr. at 104, and court colloquy suggested that Michael Long had been "found guilty" after a just concluded second, bench trial, *id.* at 16-17). The trial court released its Decision and Entry Finding Ms. Margaret Long Guilty of Contempt on February 3, 2020. That decision detailed the exhibits that the trial court reviewed, including evidence of nine Facebook postings by Ms. Long that the state contended showed contempt. Of those, the trial court found that several did not constitute the sort of "threats, whether express or implied, against current and former jurors, witnesses, attorneys and court personnel associated with this case" prohibited by the relevant prong of the July 12, 2018 order. *Id.* at 2, 15.

{¶ 13} As background, we note that among the postings the trial court found did not violate the no-threat Order were: a picture of Bowles family members under the heading, "Da Muthafuccrs who killed Pouncho [sic]"; a picture of one of the prosecutors in the underlying case, who then had become a judge; and a reposting of case commentary under the words, "I'm applying pressure." Feb. 3, 2020 Decision & Entry at 3-6. The trial court also had before it evidence of other postings by Ms. Long depicting members of the Bowles family in various contexts, a posting by a Bowles family member directed at Ms. Long, and a video of a segment from the December 17, 2019 trial of Michael Long in which Margaret Long was removed from the courtroom and then the courthouse for grimacing or making other faces while a Bowles witness testified. *Id.* at 7-9; Jan. 21, 2020 Tr. at 118-30. The trial court also reviewed that witness's testimony relating to what was said to be the "significant negative effect" that certain of Ms. Long's postings had had on the Bowles family. Feb. 3, 2020 Decision & Entry at 9.

{¶ 14} The trial court found that three of Ms. Long's postings, especially in the context of the "emotion and anger" suggested by other postings and by her (subsequent) facial expressions that led to her ejection from the trial, constituted threats in violation of the Order.  *Id.* at 9, 13.

- Exhibit A-6 read, in part:  "IDGAF NOMORE MY BROTHER GONE... ERRBODY INVOLVED N DIS CASE, I'M @YALL MUTHAFUCCN NECKS." Feb. 3, 2020 Decision & Entry at 6; Ex. A-6. In context, the trial court determined, "this is clearly a threat.  It's a message from someone who [is] ready to strike out against anyone who has been involved in the case * * *.  She is not just speaking about her anger anymore; she is speaking about taking action."  Feb. 3, 2020 Decision & Entry at 10-11.

- Exhibit A-8 read:  "HEY ARYAN BROTHERHOOD!! TIMOTHY BOWLES ISSA SNITCH, LQQKS LIKE SUMA YALL IS GOIN DOWN ... WAIT 4 IT... LMAOOO." *Id.* at 6 and Ex. A-8.  The trial court determined that with this posting, Ms. Long "is clearly hoping that the might of the Aryan Brotherhood would descend upon Bowles, and she is not above using lies to reach that end. * * * Her intent is clear: to threaten Timothy Bowles, as well as to incite violence against him." *Id.* at 11.

- Exhibit A-9 read, in part:  "MY SON MICHAEL A LONG, WILL B #FREE... THEN  I'M CUMIN 4 U RON O'BRIEN & DA REST OF U CROOKD ASS PROSECUTORS, LAWYERS & JUDGE." *Id.* at 6 and Ex. A-9.  The trial court found this to be "couched as a clear threat," and discounted the argument of Ms. Long's counsel that these words were a threat to litigate: that argument could not wash, the trial court said, absent "evidence that this was her actual intent * * *," or "a good faith [legal] argument that there actually was somebody she could successfully sue."  *Id.* at 11-12 (citing a prosecutorial immunity case, *Imbler v. Pachtman*, 424 U.S. 409 (1976), and also observing that "the trial judges have absolute immunity as well").

{¶ 15}  "While it is evident that not all of Ms. Long's postings constitute threats, some do," the trial court concluded, "and that is sufficient to once more make a finding that Ms. Long is in contempt of court."  *Id.* at 15.  The trial court sentenced Ms. Long to 50 days in

jail, with the sentence stayed as to 40 of those days "until such time as her direct appeals have been concluded." Feb. 27, 2020 Judgment Entry at 2; *compare* R.C. 2705.05(A)(2) (limiting maximum jail sentence for second contempt offense to 60 days).

{¶ 16} Ms. Long makes three assignments of error:

[1.] The July 12, 2018 Order is unlawful, and therefore appellant cannot be punished for indirect contempt.

[2.] The July 12, 2018 Order violates the First Amendment to the United States Constitution and Article I, Section 11 of the Ohio Constitution.

[3.] The trial court violated Appellant's rights to due process and a fair trial when it entered a judgment of conviction based on insufficient evidence and against the manifest weight of the evidence in violation of Appellant's rights under the United States and Ohio Constitutions.

Appellant's Brief at vii (capitalizations adjusted).

{¶ 17} The assignments are interrelated, we think, because we do not read the no-threat portion of the trial court's Order to reach constitutionally protected speech, and we must examine the evidence for alleged violation of the Order in that light and in recognition of the constitutional constraints that inform our understanding (and the trial court's) of its terms. We note that Ms. Long challenges the validity of the no-threat directive on its own merits and does not argue that it is vitiated by its placement with the further prongs of the Order that the trial court prudently decided not to apply. Because the no-threat directive was the only part of the Order that Ms. Long was found here to have violated, and because she makes no argument that we should assess the Order beyond that prong, our assessment focuses on that aspect of the Order alone.

{¶ 18} For context (including why we do not simply defer to the joint state and defense view that the contempt finding should be reversed), we begin by sketching our understanding of the judicial contempt power. So informed, we dispense with what we understand to be Ms. Long's arguments under her first assignment of error that (1) the no-threat order here constituted "legislating from the bench" because it is up to the General Assembly to define criminal offenses in Ohio and "menacing statutes set grounds to file charges if one is being threatened," Appellant's Brief at 12, 13; so that (2) the allegations against Ms. Long should have been treated "like any other potential criminal case,"

necessitating processes such as "grand jury indictment" and a "right to a trial by jury," Appellant's Brief at 13, 14; and (3), in any event, "Ms. Long, as a non-party, cannot be punished for indirect criminal contempt[,]" Appellant's Brief at 9, 13, and 16-19. Ms. Long cites us to no direct authority establishing any of these propositions, and we decline to adopt them in the circumstances of this case.

{¶ 19} For starters, the General Assembly *has* specified that "[a] person guilty of * * * [d]isobedience of * * * a lawful * * * order * * * or command of a court" may "be punished as for a contempt[.]" R.C. 2705.02(A). More fundamentally, however, "[t]he power of contempt is inherent in a court, such power being necessary to the exercise of *judicial* functions." *Denovchek v. Bd. of Trumbull Cty. Commrs.*, 36 Ohio St.3d 14, 15 (1988) (emphasis added; numerous citations omitted); *see also id.* (with citations omitted) ("We have defined 'contempt of court' as 'disobedience of an order of a court. It is conduct which brings the administration of justice into disrespect, or which tends to embarrass, impede or obstruct a court in the performance of its functions,' "); *State ex rel. Lowery v. McArver*, 10th Dist. No. 09AP-313, 2009-Ohio-6844, ¶ 7 (the "inherent [contempt] power arises from the judiciary's need 'to uphold and ensure the effective administration of justice' and 'to secure the dignity of the court and to affirm the supremacy of law' ") (citations omitted); *Anderson v. Smith*, 196 Ohio App.3d 540, 2011-Ohio-6619, ¶ 9 (10th Dist.) ("The General Assembly has enacted statutes governing the exercise of a court's inherent power to punish contempt, under R.C. Chapter 2705, but '[t]he accepted doctrine is that statutes pertaining to contempt of court merely regulate the power of the court to punish for contempt, instead of creating the power[,]' " citing *State ex rel. Turner v. Albin*, 118 Ohio St. 527, 531 (1928)).

{¶ 20} And because the contempt power inheres in the judiciary, which is responsible for its appropriately circumscribed exercise, we do not relinquish it to prosecutors (however "independent." *Compare* Appellant's Brief at 14). Or to juries. *See, e.g., Akron v. Wilson*, 9th Dist. No. 15565, 1992 Ohio App. Lexis 4743, *4-6 (contemnor received due process, having had notice, an opportunity to be heard, and the charges proved beyond a reasonable doubt; "[a] court may punish contempt of court because of its inherent power. The power to punish criminal contempt does not arise from any legislative enactment; it is * * * a result of the court's inherent authority"; moreover, "the General Assembly explicitly made the court the fact-finder at a contempt hearing"); *compare State*

*v. Weiner*, 37 Ohio St.2d 11, 13 (1974) ("there need be no jury trial" for contempt as a petty offense); *Cheff v. Schnackenberg*, 384 U.S. 373, 380 (1966) (federal constitution does not require jury trial for contempt with sentence of six months or less [but would for sentence of more than six months]).

{¶ 21} Ms. Long's contention that the judicial contempt power cannot extend in cases of indirect criminal contempt to people with actual notice of a court's order but who are not parties to the action in which the order issued is similarly without apparent support. *Compare, e.g., Midland Steel Prods. Co. v. Internatl. Union, United Auto, Aerospace & Agricultural Implement Workers, Local 486*, 61 Ohio St.3d 121 (1991), paragraph one of the syllabus (temporary restraining order punishable by contempt may be binding on nonparty aider and abettor who has "actual notice of the terms of the order"); *Beaver Excavating Co. v. Perry Twp.*, 79 Ohio App.3d 148, 153 (5th Dist.1992) (cited by trial court; for purposes of frivolous conduct statute, "contempt proceedings against a non-party witness constitute a civil action").

{¶ 22} While citing no authority in support of her own proposition, Ms. Long does attempt to distinguish two of the cases cited in this area by the trial court. She tries to distinguish *Planned Parenthood Assn. of Cincinnati v. Project Jericho*, 52 Ohio St.3d 56 (1990), on the basis that the nonparty contemnors there "acted in concert with" parties in the underlying case. *See* Appellant's Brief at 15-17. Then, while conceding that the "District Court did note [in dicta in *Blasi v. United Debt Servs.*, S.D.Ohio No. 2:14-cv-083, 2017 U.S. Dist. Lexis 121537 (Aug. 2, 2017)] that contempt sanctions can be assessed against non-parties," Ms. Long falls back on the contention that "the cases cited in *Blasi* were all civil cases and involved contempt in those proceedings." Appellant's Brief at 17-18 (adding that "[w]hile [Ms. Long] certainly supported her son and his pursuit of freedom, her own personal freedoms were not at stake [in] * * * Mr. Long's criminal case").

{¶ 23} We do not find these distinctions persuasive in this context. The trial court's July 12, 2018 Order applied by its specific terms to Mr. Long's "mother." The trial court gave her personal notice of the Order (as then reestablished through the first contempt proceeding). On these facts, the trial court did indeed have legitimate concerns for the integrity of the criminal proceeding. Within proper bounds, a court does have authority to invoke the penalties of contempt in order to maintain "the authority and proper functioning of the court" in seeking the " 'unimpeded administration of justice.' " *Denovchek*, 38 Ohio

St.3d at 16, quoting *Windham Bank v. Tomaszczyk*, 27 Ohio St.2d 55 (1971), paragraph two of the syllabus. The trial court had authority to include nonparty Ms. Long within the scope of its no-threat Order.

{¶ 24} To the extent that Ms. Long's first assignment of error rests on arguments not contemplated by her next two assignments, we overrule it.

{¶ 25} Ms. Long argues under her second assignment of error that the no-threat prong of the Order violated her free speech rights. Appellant's Brief at 19-35. Here, Ms. Long invokes both the First Amendment to the United States Constitution and (in passing) Article I, Section 11 of the Ohio Constitution.

{¶ 26} Had she made a particular argument that the Ohio Constitution invalidates the no-threat Order for reasons not dependent on First Amendment analysis, we would, as an Ohio court, consider those arguments first. But, beyond a generic introduction, she provides us with no analysis specific to the Ohio Constitution, and instead focuses her attention on case law construing or effectuating the First Amendment. *Id.* at 20-34; *see, e.g., id.* at 21 (quoting *Bey v. Rasaweh*, 161 Ohio St.3d 79, 2020-Ohio-3301, ¶ 21, citing *Virginia v. Black,* 538 U.S. 343, 358 (2003), on the point that "[t]he right to free speech secured by the First Amendment is not absolute, however, and the government may regulate it in a manner that is consistent with the Constitution"); and at 22 (citing *Bey* at ¶ 24 for point that "[l]ike the statutes that regulate speech, court-ordered injunctions that regulate speech are also subject to First Amendment scrutiny," citing *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 757 (1994)). Thus Ms. Long submits as her argument under this assignment that the trial court Order "constituted an impermissible prior restraint on Ms. Long's First Amendment right to free speech." Appellant's Brief at 22. (This exclusive First Amendment focus may be understandable in light of instruction by the Supreme Court of Ohio that "[u]nder the Ohio Constitution, free speech guarantees are no broader than those guaranteed by the First Amendment to the United States Constitution. The First Amendment is the proper basis for interpretation of Section 11, Article I, Ohio Constitution, the provision that establishes those free speech guarantees in Ohio." *Cleveland v. Trzebuckowski*, 85 Ohio St.3d 524, 528 (1999) (citations omitted).)

{¶ 27} We readily adopt the premise of Ms. Long's argument that court orders that impose prior restraints infringing on protected speech are subject to strict scrutiny as outlined by the United States Supreme Court. Appellant's Brief at 23-25. But Ms. Long

herself "acknowledges that content-based regulations can be [established] for certain classes of unprotected speech, such as 'threatening words * * *.' " *Id.* at 26, citing *inter alia Bey* at ¶ 38. As *Bey* informs us: "The First Amendment does 'permit[ ] restrictions upon the content of speech in a few limited areas.' * * * Those categories include: * * * true threats * * *," 2020-Ohio-3301, at ¶ 38, quoting, *inter alia*, *United States v. Alvarez*, 567 U.S. 709, 717 (2012).

{¶ 28} Ms. Long then reasserts, again without citation, that government's ability to regulate even unprotected speech "comes with the caveat that alleged threatening words are to be punished in Municipal Court or after grand jury indictment." Appellant's Brief at 26; *see also id.* at 29-30 (because General Assembly "has created laws to handle words deemed 'threatening,' * * * no court order is needed to prohibit such words from being expressed via social media. If the words used by non-parties cross the line and become threatening * * *, then the person utilizing such language can be criminally prosecuted under the laws created by the General Assembly"). We already have explained that the law of contempt as punishable in Ohio to protect the integrity of the court process—a process that courts can guard so as to be " 'uninterrupted,' " *see Denovchek* at ¶ 16, quoting *Windham Bank*—envisions no such grand-jury-like executive branch prosecution. *See also, e.g., Citicasters Co. v. Stop 26-Riverbend*, 147 Ohio App.3d 531, 2002-Ohio-2286, ¶ 74 (7th Dist.) ("certain statutory procedures applicable to purely criminal proceedings such as indictment, arraignment, plea and trial by jury are not necessary procedures in cases of criminal contempt") (citation omitted).

{¶ 29} Ms. Long argues further that the legal process that resulted in the contempt ruling at issue here is invalidated by the Supreme Court's subsequent decision in *Bey*. Appellant's Brief at 27-30. The state agrees, and joins in urging reversal on this ground: "[T]he State concedes that the July 12th order cannot be upheld as a valid order because it constituted a prior restraint under the First Amendment case law. Under *Bey*, even an order having protective purposes will be deemed a prior restraint when it reaches matters of speech, even when it is addressing matters that are not protected by the First Amendment, such as * * * threats, when the order purports to regulate future speech." Appellee's Brief at 5 (further positing that although government can restrain unprotected speech, "such restraints must come after the matter is fully litigated and the person(s) subject to the restraints have been afforded the opportunity to oppose the contemplated

restraints through a full hearing"), and at 6 (referring to procedures under R.C. 2945.04(A)(2) relating to orders against intimidating witnesses, victims, or lawyers, but also seeking to preserve a case for contempt in these circumstances without regard to violation of any court order). *Compare* Appellant's Reply Brief at 1 (agreeing, understandably if uncritically, with state's bottom line that *Bey* warrants reversal).

{¶ 30} We do not lightly differ with conclusions shared by both sides in litigation, but we think that Ms. Long and the state misread and misapply *Bey*. That case involved a prohibition on expression that swept far beyond unprotected speech to encompass any "posting about Petitioners [for the civil stalking protective order]" without limitation, and the respondent further was ordered to refrain from any posting that opined that petitioners were culpable in the deaths of their husbands. 2020-Ohio-3301 at ¶ 5. The very first sentence of the Supreme Court's decision flagged that court's focus on protected speech: "In this discretionary appeal we are asked to determine whether a civil-stalking protection order enjoining future postings about a petitioner imposes an unconstitutional prior restraint on *protected speech* in violation of the First Amendment to the United States Constitution." *Id.* at ¶ 1 (emphasis added).

{¶ 31} The protection order ran afoul of the First Amendment, the Supreme Court said, because "[a] regulation of [future] speech that is 'about [the petitioners]' is necessarily a regulation of the subject matter of that speech," *id.* at ¶ 33, and there had been "no judicial determination" that potential future postings fitting into the proscribed category would fall within one of the limited categories of speech "unprotected by the First Amendment" (there, potentially, as "speech integral to criminal conduct,") *id.* at ¶ 38, 41. *See also id.* at ¶ 45 ("In the case before us, however, there has been no such judicial determination that future postings by [respondent] will be an integral means to criminal conduct and thus unprotected by the First Amendment").

{¶ 32} The problem in *Bey*, therefore, was that the defined category of enjoined speech was potentially broader than any specific category of unprotected speech, and there had been no judicial determination that there was a sufficient match between imaginable future speech as banned and the narrow classes of speech that the courts have found unprotected so as to justify prior restraint. *See also id.* at ¶ 47 ("the record here cannot justify a content-based prior restraint on speech when there has been no valid judicial determination that such speech will be integral to criminal conduct, defamatory, or

otherwise subject to lawful regulation based on its content"). In sum, "[b]ecause there was no valid judicial determination that any future Internet postings that [respondent] might make about [petitioners] would necessarily be * * * proscribable, that future expression would not be excluded categorically from First Amendment protection.  The trial court's CSPOs thus represent[ed] prior restraints that are unconstitutional unless they can survive strict scrutiny."  *Id.* at ¶ 50.

{¶ 33} Here, however, and unlike the injunction at issue in *Bey*, the third prong of the trial court's Order against threats to jurors, witnesses, lawyers, and court personnel associated with the case did not extend more broadly than a category of speech that the courts already have determined to be categorically unprotected.  As *Bey* recites:  "The First Amendment does 'permit[] restrictions upon the content of speech in a few limited areas.' Those categories include:  * * * 'true threats.' "  *Id.* at ¶ 38 (citations omitted); *see also, e.g., Virginia v. Black*, 538 U.S. 343, 358 ("the government may regulate certain categories of expression consistent with the Constitution") (citation omitted), 359 (the "First Amendment * * * permits a State to ban a 'true threat' ") (citing, *inter alia*, *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992), for point that " '[t]hreats of violence are outside the First Amendment' ").  Thus, for example, the federal law against knowingly and willfully threatening bodily harm to the President of the United States "is constitutional on its face." *Watts v. United States*, 394 U.S. 705, 707 (1969).

{¶ 34} Importantly, then, "[w]hat is a threat must be distinguished from what is constitutionally protected speech."  *Id.*  *Virginia v. Black* elaborates.  " 'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals."  538 U.S. at 359 (citing *Watts*; further citation omitted).  Thus, "a prohibition on true threats 'protects individuals from the possibility that the threatened violence will occur.' "  *Id.* at 360.

{¶ 35} Also significantly, then:  " 'When the basis for the [regulatory] content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable, no significant danger of idea or viewpoint discrimination exists.  Such a reason, having been adjudged neutral enough to support exclusion of the entire class of speech from First Amendment protection, is also neutral enough to form the basis of distinction within the class.' "  *Id.* at 361-62 (quoting *R.A.V.*)  We understand *Bey* to be

entirely consistent with this instruction from the United States Supreme Court and not, despite what we take to be the suggestions of Ms. Long and the state, to require further (and redundant) trial court determination that a category of speech unprotected by the First Amendment is categorically proscribable. *See also, e.g., United States v. Kaun*, 827 F.2d 1144, 1150 (7th Cir. 1987) ("the injunctive order does not impermissibly infringe upon Kaun's freedom of expression * * * because it restrains only unprotected speech").

{¶ 36} Even without this backdrop, the most natural reading of the trial court's no-threat Order, and the one seemingly accorded it by the trial court in making its contempt finding, is that it prohibited true threats against the protected trial participants until the end of the trial. (Indeed, the evolution of the U.S. Supreme Court's phrase "true threat" seems to have begun with the observation in *Watts* that the statute at issue there "requires the Government to prove a true 'threat.' " 394 U.S. at 708.) Thus, for example, the trial court in declining to dismiss the motion to show cause and in proceeding with the contempt hearing emphasized that even in the normal course, "no one, in the news media or otherwise, would be permitted to make ***threats*** to witnesses, jurors, etc." Jan. 15, 2020 Decision & Entry Denying Dismissal at 10 (emphasis in original, and adding, again with emphasis that "that is especially true of persons who were placed on ***actual notice*** that such conduct was prohibited"). Consequently, the trial court did not find that Ms. Long's posting "I'm applying pressure" could be said beyond a reasonable doubt to "qualif[y] as a threat," *see* February 3, 2020 Decision at 5, whereas it did find contempt in a posting that it found to express a readiness "to strike out against anyone who has been involved in the case," *id.* at 10. The trial court clearly and appropriately read the Order to use the word "threat" in the context of a threat of physical harm, as opposed, for example, to an expressed intent to "take legal remedies," *id.* at 11; thus, the trial court underscored: "the question is not whether physical harm has *occurred*, it is whether a threat has been *made*," *id.* (emphasis added). And Ms. Long's counsel has voiced the same understanding. *Id.* ("Counsel for Ms. Long also argues that 'If she * * * intended to cause harm, certainly there would be some evidence in the record of that,' " citing to Ms. Long's Jan. 29, 2020 Reply to State's Memorandum Contra dismissal); *see also, e.g.,* Appellant's Brief at 43 (using "threat" to mean "physically threatening"); Appellant's Reply Brief at 8 (social media post that "I'm comin 4 u" could mean "coming at them in the legal sense" and thus "cannot be

considered a 'threat' beyond a reasonable doubt"; further interpreting "threat" to mean "physically threatening").

{¶ 37} Thus, to summarize: The natural reading of the relevant prong of the trial court's July 12, 2018 Order is that it prohibited true threats as made by specified people including Ms. Long, directed against the specified categories of trial participants including jurors and witnesses, and as confined to the period ending with the conclusion of the second trial. Because that prong of the Order did not reach beyond constitutionally unprotected speech, the Order itself and on its face was not undermined by the subsequent Supreme Court of Ohio decision in *Bey*. *Compare* Appellant's Brief at 27-28; Appellee's Brief at 5; Appellant's Reply Brief at 1, 5.

{¶ 38} Ms. Long's argument in support of her second assignment of error (which is phrased as a purely facial challenge to the Order itself) at points conflates the facial validity of the no-threat Order with the trial court's later application of that Order to particular postings as made by Ms. Long. *See, e.g.,* Appellant's Brief at 29 (in finding contempt, the trial judge "acknowledged the postings here were subject to different interpretations"), 35 ("Ms. Long dared to criticize the criminal justice system. * * * * She was giving her opinions on the evidence. * * * * Ms. Long had every right to question, criticize, or condemn the actions of government"). But the facial validity of the order against making threats to witnesses, potential jurors, lawyers involved in the case, and court personnel is quite analytically distinct from any misapplication of that Order to statements that in context do not amount to true threats. We overrule Ms. Long's second assignment of error.

{¶ 39} But the natural reading of "threat" in the context of the trial court's July 12, 2018 Order to mean a true threat, encompassing in this context the *Virginia v. Black* sense of statements made "to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals," 538 U.S. at 359, does very much also inform our review of Ms. Long's third assignment of error. We conclude that in the context of this factual record, and in reference to the particular court Order on which the trial court based its finding of contempt, the manifest weight of the evidence does not establish beyond a reasonable doubt that Ms. Long threatened physical violence against protected individuals.

{¶ 40} "When appellate review of a contempt adjudication entails an inquiry into the weight of the evidence to sustain the judgment, the applicable standard of review turns

upon the nature of the contempt decree. * * * [A] judgment of criminal contempt requires proof beyond a reasonable doubt." *ConTex, Inc. v. Consol. Technologies, Inc.*, 40 Ohio App.3d 94, 95 (1st Dist. 1988), citing *Brown v. Executive 200, Inc.*, 64 Ohio St.2d 250 (1980). "[W]hen reviewing a finding of indirect criminal contempt, an appellate court must start by viewing the case in the light most favorable to the trial court and determining whether the facts would convince the average person beyond a reasonable doubt that the conduct of the accused evinced an intent to violate the court's order or to impede the administration of justice. In essence, reviewing a finding of indirect criminal contempt requires that we consider whether the evidence was insufficient and also whether the finding was against the manifest weight of the evidence." *Rohr Corp. v. Wendt & Sons*, 1st Dist. No. C-961051, 1997 Ohio App.Lexis 5506, * 10-11; *see also id.* at * 16 (reversing judgment of contempt because "intentional violation of the court's order was not proved beyond a reasonable doubt"); *compare In re Statman*, 1st Dist. No. C-5229206, 2020-Ohio-4285, ¶ 40 ("we hold that the evidence was insufficient to support the judge's findings * * * and we, therefore, reverse" the judgment of contempt); *State v. Daly*, 2d Dist. No. 20-07 CA 26, 2007-Ohio-5170, ¶ 53, 55 (evidence was legally sufficient to support contempt, but "[c]onsidering the entire record before us, we find no reasonable basis to hold [lawyer] in contempt"; judgment of indirect contempt reversed on manifest weight analysis).

{¶ 41} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony": such determination is reserved only for the "exceptional case." *State v. Thompkins*, 78 Ohio St.3d 380, 387; *see also, e.g., State v. Fabal*, 10th Dist. No. 20AP-86, 2021-Ohio-1793, ¶ 38-39 (citations omitted) ("When presented with a manifest weight challenge, an appellate court engages in a limited weighing of the evidence to determine whether sufficient competent, credible evidence supports the [factfinder's] verdict. * * * * An appellate court considering a manifest weight challenge 'may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed' * * *").

{¶ 42} It is worth noting that while we afford great deference to a factfinder's credibility assessments, *Fabal* at ¶ 38, here there were none: the trial court's determinations of indirect contempt were made on the basis of an essentially stipulated record, following argument by counsel but not witness testimony. Jan. 21, 2020 Tr. The trial court had before it the physical exhibits we find in the record, including the copies of the postings that its decision catalogued. We assess those materials, too, now in the context of gauging whether in the circumstances outlined above a reasonable finder of fact could have found beyond a reasonable doubt that they constituted true threats of physical violence. We recognize that we benefit in this review by the opportunity we have had to analyze the scope, contours, and limits of the no-threat Order.

{¶ 43} The first of the three exhibits on which the trial court hinged its contempt judgment included commentary on the evidence against Michael Long, along with the lines, "IDGAF nomore my brother gone...Errbody involved n dis case, I'm @ yall muthafuccn necks." Ex. A-6; Feb. 3, 2020 Decision & Entry at 6, 11. Just how metaphorical this phrase is in this context is open to doubt. But we find it instructive that the prosecutors who urged the contempt themselves used the expression metaphorically in their argument to the trial court: when witnesses came to court, the state argued, Ms. Long "applied her other pressure [beyond postings to identify witnesses against her son] and was *at their necks* in other ways by leaning over the halfway and glaring at our witnesses to the point where she got herself kicked out of the courtroom." Jan. 21, 2020 Tr. at 61 (emphasis added). (The prosecutor later provided further context in describing trial footage: "you can see * * * she's leaning over the railing now. * * * * You can see she slid over in my effort to sever her line of site." Jan. 21, 2020 Tr. at 120 (sic). But shifting to keep a witness in one's line of sight, or even "glaring" at an adverse witness, is not in the context of this case a threat of physical violence beyond a reasonable doubt.)

{¶ 44} Later in the argument, the state returned to the same metaphorical turn of phrase: "she was *at their necks*, and she was certainly applying pressure when they came to testify by being at the front of the railing like she was." *Id.* at 109 (emphasis added).

{¶ 45} Ms. Long certainly let it be known that she was displeased by the state's case against her son and that she was following the proceedings intensely and with a highly skeptical eye. *See* Feb. 03, 2020 Decision & Entry at 10 ("Ms. Long's face-making at the very least shows her astonishment and disgust at what she's hearing * * *. "). Expressions

of disbelief or disgust, however, and "being at the front of the railing" are not categorically constitutionally unprotected speech of the sort prohibited by the trial court's no-threat order. We note, too, that the state more than once used the expressions "at their necks" and "applying pressure" in tandem, and that the trial court found that the "I'm applying pressure" statement did *not* qualify as a threat beyond a reasonable doubt. *Id.* at 5.

{¶ 46} The second exhibit on which the trial court rested its contempt judgment was addressed to the "Aryan Brotherhood" (not a protected group under the terms of the trial court's July 12, 2018 Order). Ex. A-8; Feb. 3, 2020 Decision & Entry at 6, 11. Presumably without basis, it advises the "Brotherhood" that (witness) "Timothy Bowles issa snitch," and warns the "Brotherhood" that it "lqqks like suma yall is goin down…" *Id.*

{¶ 47} However false and or malicious this posting was, its publication was fully accomplished at the time of the posting, and the record reflects no warning to any member of the Bowles family that it was forthcoming. Its intent may have been, as the trial court found, "to incite violence against" Mr. Bowles, *id.* at 11, but by its own terms, at least, and although in the trial court's view retaliatory, it was not a threat; it was a fait accompli. In concluding that it was a threat, the trial court assessed this posting as a particular, one-time event of reprisal, and observed that "there is nothing to prevent someone who *does* read the post from bringing it to the attention of others." *Id.* While that fact may make the post a danger, it does not convert it into "a serious expression of an intent to commit an act of unlawful violence," in the words of *Virginia v. Black.* It is not a "threat" in a way contemplated by the terms of the relevant prong of the July 12, 2018 Order.

{¶ 48} The last exhibit the on which the trial court based its contempt finding read, over a picture of Michael Long in the county jail: "My son Michael A Long, will B #free…Then I'm cumin 4 U Ron O'Brien & da rest of U crookd ass prosecutors, lawyers & judge…." Ex. A-9; Feb. 3, 2020 Decision & Entry at 6, 11-12. The trial court disagreed with the argument of Ms. Long's counsel that this posting suggests potential legal action against her targets. "The problem with this argument is that there is simply no evidence to support it," the court opined: "There is a complete absence of evidence in the record that this is what was going through Ms. Long's mind." Feb. 3, 2020 Decision & Entry at 12.

{¶ 49} We do not take these passages from the trial court's contempt decision as ignoring or inverting the standard that "the burden of proof in criminal contempt is proof beyond a reasonable doubt." *See Liming v. Damos*, 133 Ohio St.3d 509, 2012-Ohio-4783,

¶ 11 (citations omitted). But neither are we convinced by the trial court's extended rationale that before one could consider reading the post as threatening legal action, "there must be one of two things, either that there is evidence that this was her actual intent when she wrote the posting, or there is a good faith [legal] argument that there actually was someone she could *successfully* sue." Feb. 3, 2020 Decision & Entry at 12 (emphasis added). The trial court recited that "prosecutors * * * have absolute immunity from suit," citing *Imbler*, 424 U.S. 409, and that "of course the trial judges have absolute immunity as well." *Id.* at 12 (also noting that "[w]ho the other 'lawyers' are is unstated").

{¶ 50} The record does not reflect that Ms. Long is a lawyer, or that we should ascribe to her an encyclopedic knowledge of United States Supreme Court jurisprudence. Moreover, the trial court's rationale fails to address not only the possibility that Ms. Long also envisioned political avenues of "cumin 4" at least prosecutors and judges whom she deemed corrupt, but also the possibility of ethics complaints that Ms. Long may have had in mind later at sentencing when she told the trial court: "I said I was going to file complaints and I'm already in the works. I got the paperwork in the right hands. I'm going after the prosecutor's office." Feb. 10, 2020 Tr. at 173. (This statement seems to have been made in the further context of the trial court's having read into the sentencing record a later posting by Ms. Long, put forward by the state but apparently discounted by the trial court, surmising that the underlying case against her son "was a cover-up, so they didnt hav 2 release info 2 da public abt" a massive weapons cache and "Aryan Brotherhood ties" – "Yall gav me 2 much time & now I got da paperwork N2 da rite hands .... LMAOOO * * *." Ex. B; *Id.* at 152-53. No one argues that references to "paperwork" and "complaints" constitute true threats of physical violence.)

{¶ 51} The "cumin 4" language cannot be stripped from its predicate that Michael Long will first achieve his freedom. ("My son * * * will B #free...*Then* I'm cumin 4 U"). Ex. A-9 (emphasis added). Whatever retaliation Ms. Long meant to suggest—bar disciplinary ethics complaints, lawsuits, political action, or physical harm—would come only after her son had been freed. That contingency makes at least as much sense, and maybe more sense, as a significant (if not legally necessary) component to subsequent lawful action than as a precondition for delayed violence (and why such unlawful action would need to await adjudication clearing the son is not specified any more than the contemplated action itself).

{¶ 52} We conclude that this sentiment, both so vague and so contingent (with the stated potential future action not meant either to advance or to deter the stated condition precedent) cannot be deemed a true threat beyond a reasonable doubt. The contingent statement at issue here is nothing like, for example, the one discussed in *Columbus v. James*, 10th Dist. No. 87AP-1218, 1988 Ohio App.Lexis 3748, * 12, "that promises an attack if the victim does something," with the conditional threat being "a means to deter the activity of the victim").

{¶ 53} Because our review of the weight of the evidence is that contempt of court could not be said to have been established here beyond a reasonable doubt, we sustain Ms. Long's third assignment of error.

{¶ 54} We decline what we understand to be the state's invitation somehow to speculate on hypothetical contempt adjudications not based on the trial court's July 12, 2018 Order. *Compare* Appellee's Brief at 6.

{¶ 55} We reverse the finding of contempt by the Franklin County Court of Common Pleas and remand the matter to that court so that the matter may be concluded consistent with this decision.

*Judgment reversed; case remanded.*

KLATT and LUPER SCHUSTER, JJ., concur.

NELSON, J., retired, of the Tenth Appellate District, assigned
to active duty under the authority of the Ohio Constitution,
Article IV, Section 6(C).

_____